State *v.* Boston, Concord & Montreal Railroad Co.

THE STATE *v.* BOSTON, CONCORD AND MONTREAL RAILROAD COMPANY.

*Quo Warranto.* *The right of a Corporation chartered in one State, to hold lands in another State, discussed.*

The right of aliens to hold real estate in this State, considered.

The right of the Supreme Court to issue the writ of *quo warranto*, is recognized, in general terms, by our statutes,—the occasions are left to be determined by common law rules. And, by those rules, it is apparent the writ is the appropriate mode in which to try any alleged usurpation of offices, or franchises, inconsistent with the State sovereignty.

The right of a corporation chartered in another State, to hold lands in this State, discussed and granted.

THIS is an information, filed by the State's Attorney for the county of Orange, praying for a writ of *quo warranto* against the defendants, who are a railroad corporation just going into operation in the State of New Hampshire. It is averred in the information, that the defendants have, without authority from this State, erected a railroad bridge across Connecticut River, and extending within this State, and that they have purchased and hold deeds of land within this State,—and that they occupy and use said bridge and land, claiming right to do so, and claiming to be owners in fee of the land;—and the defendants are required to show by what warrant they " claim to take, hold, occupy, enjoy and exercise the premises and franchise aforesaid."

Testimony was taken, but as the facts fully appear in the opinion of the court, it is not deemed necessary to report the same.

*L. B. Peck* and *L. Underwood* for the State.

I. Have the defendants the right to hold the title of the lands as against the State?

II. Is this the proper remedy to try the right?

III. Should the court, in the proper exercise of its judicial discretion, permit the information to be filed?

1. As to the right to hold the land.

This involves an inquiry into the powers of a corporation, created in another State, to operate in this State.

The courts of one State will, from comity, enforce the contracts made by the corporation of a foreign government, or of a sister State, if legally made, upon the same principle that they will entertain suits in favor of an alien friend.

But an alien friend cannot hold land against the government. His title is good as against every body else.

So it must be with foreign corporations. Individuals cannot disturb their title. But may not the government?

The right to exercise *corporate franchises* is confined to the State creating the corporation.

If it was not, its powers might be *exercised* in all the States of the Union.

A banking company in New York might establish offices of discount in this and other States.

A manufacturing company in Mass. might erect factories and operate as a corporation.

The same power would be possessed by a railroad corporation in N. H. to act under their charter in this State.

Even the power of the general government is denied to authorize a company to construct a railroad through the States without their assent.

The position then may be assumed, that the right to *exercise* a *corporate franchise* is *local.*

The fact that a *contract* made by one of our own citizens with the corporation of another State, is obligatory and will be enforced here, does not affect the question, for such contract is regarded as made in the State where the company is located.

Is the *right* to hold real estate in a corporation a franchise?

Most certainly, it is.

The very existence of a corporation is a franchise, as without the act of incorporation they would have no legal existence.

Every act they have a right to do is a franchise. *People* v. *Geneva College,* 5 Wend. 211.

The right, then, to hold the title of real estate, *as a corporation,* is a franchise.

The defendants claim the *right,* as a corporation, to hold land in this State. They thus claim to exercise *here* a *franchise,* by virtue of their N. H. grant of power.

State *v.* Boston, Concord & Montreal Railroad Co.

If they may legally exercise this franchise in this State, why not any and every other right conferred by their act of incorporation?

If they can own and hold land here, why not construct and run upon it a railroad? Where is the limit of their power? That they do not intend to do anything more than hold the land, does not touch the question. If they have the right to hold it, they have the right to occupy it as they please.

Is the principle to be tolerated, that corporations of other States may come here and purchase and hold the title of our lands, for speculating and other purposes?

2. As to the remedy.

If the defendants have no right to hold the land without a grant from this State, then it is a *franchise which they have no right to enjoy*, and they may be ousted on this proceeding.

Indeed it is the *only* remedy. What other course could the State take, to try the question?

3. Should leave be granted to file the information?

In England, the Attorney General, in relation to all franchises affecting the public, has the right, on his own authority, to file an information. The King's Coroner had the same right formerly, but by Stat. 405 William and Mary, he can now only do it on leave. of the King's Bench.

By Stat. of Ann, on leave of court, an information may be filed on the relation of a person interested in a private corporation.

In this country, the Attorney General may, on his own authority, file an information.

In analogy to the Stat. of Ann, the courts of the several States permit an information to be filed on the relation of some person interested, but in no other case is it necessary to ask leave. *Rex* v. *Ogden,* 10 B. & C. 230. 5 Mass. 230. 10 Mass. 94. Angell & Ames on Corp. 753, 4, 5, 6. *King* v. *Clark,* 1 East. 43. *King* v. *Truman,* 2 B. A. 482.

Massachusetts and Pennsylvania, however, have, by acts of their Legislatures, limited this right of the Attorney General, and permit him to file informations only in cases where they direct it to be done by resolution.

This shows the *right* exists, independent of statute.

We have no Attorney General, but our State's Attorneys have

the same powers in their several counties, of an Attorney General.

If the information might have been filed without the leave of this court, it ought to be now permitted, though permission has been asked.

But why should not leave be granted?

If a *prima facie* case of usurpation is made out, and there is doubt as to defendants' right, leave is given. Angell & Ames, Corp. 769, Sec. 741, 768. 768 Sec. 740, and cases there cited.

Before there is any final adjudication in this matter, defendants can obtain a grant from the Legislature, if they are disposed to make it.

*Washburn & Marsh* for defendants.

I. An information in the nature of a writ of *quo warranto*, like the old writ of *quo warranto*, " is in the nature of a writ of right for the king, against him who claims or usurps any office, franchise or liberty, to inquire by what authority he supports his claim, in order to determine the right." 3 Bl. Com. 263. 6 Com. Dig. (161,) *quo warranto* A. Finch, 164. 2 Bl. Com. 37. Ang. and Am. on Corp. 618.

But the purchase and holding of real estate is not the exercise of a *franchise*, and the title to real estate cannot be tried by this proceeding;—the mere taking and holding of title to real estate is no more the exercise of a franchise by a *corporation*, than by an *individual*. It is not in derogation of the rights of the State; for the State claim no right to the land, as such, but can only claim exclusive jurisdictional power over it. It follows, that a proceeding by *quo warranto* cannot be sustained merely to try the title to real estate purchased by a corporation. It was not the appropriate remedy at common law; 6 Com. Dig. 161; and its application has not been enlarged by statute in this State.

A corporation, at common law, has precisely the same rights with an alien; and the most that can be claimed in this case is, that the corporation of another State has no more rights within this State, than a non-resident alien would have. An alien, at common law, is of capacity to take a fee simple, but not to hold. Co. Lit. 26. So a corporation, at common law, have capacity to take, but not to retain, (without license.) Ib. In either case, they may be ousted at the suit of the king, but not by *quo warranto*.

State *v.* Boston, Concord & Montreal Railroad Co.

II. But if this must be the proper mode of procedure, the court will not grant leave to file the information, and put the defendants upon proof of their right, as a matter of course, but only as a *matter of discretion, taking into consideration all the facts and attending circumstances.* (The learned counsel here cited from the following cases.) *Rex* v. *Dawes,* 4 Burr, 2022. 4 Burr, 2125. *Rex* v. *Clarke,* 1 East. 43. *Rex* v. *Stacy,* 1 T. R. 1. *Rex* v. *Parrey,* 6 Ad. & El. 810. *Regina* v. *Archdale,* 8 Ad. & E. 281. *Commonwealth* v. *Dearborn,* 15 Mass. 127. *People* v. *Hillsdale & Eastham Turnp. Co.* 2 Johns. 190. Angell & Ames on Corp. 614. *Rex* v. *Hulston,* St. 621. *Rex* v. *Ogden,* 10 B. and C. 230. In the absence of any direct allegation, that the defendants *assume to be a corporation* within this State, the case is nearly identical with that of *Rex* v. *Marsden,* 3 Burr, 1812.

III. Under the statute of this State, authorizing the Supreme Court to "*issue and determine all writs of quo warranto,*" Comp. Stat. 219, § 5,—the court have not power to entertain an information in the nature of a *quo warranto.* This was so decided by the Supreme Court of Arkansas. *State* v. *Ashley,* 1 Pike, 279.

The former is there held to be a criminal proceeding ; the judgment upon it is *seizure* and *fine,* and the judgment is conclusive, whether for or against the State. While the latter is a civil proceeding, and the judgment upon it is not final. *Rex* v. *Francis,* 2 T. R. 484.

IV. But if it should he held, that in legal effect, the information puts in issue the rights of the defendants to exercise corporate powers, and their existence as a corporation, within this State, then there is error in bringing it against the corporation by their corporate name. For this reason, leave to file the information should not be granted.

V. Corporations, existing under the authority of any other State in the Union, are entitled, upon the principles of *comity* existing between the States, and the legislation, long acquiescence, and judicial decisions in this, to exercise, within this State, all the *general corporate powers* which are conferred upon them by their charters; and the general corporate powers comprise the right to sue and be sued, the right to make contracts, and the right to hold real and personal estate.

This law of comity exists among all the States of this Union, and the

rights of parties will be governed by it in each State, unless the general statutes of the State, or a long course of settled policy, clearly indicate that such State has restricted it. *Bank of Augusta* v. *Earle*, 13 Pet. 592. Story's Conflict of Laws, 30, 34, 37. *Pearsall* v. *Dwight*, 2 Mass. 84. *Greenwood* v. *Curtis*, 6 Mass. 377. *Portsmouth Livery Co.* v. *Watson*, 10 Mass. 91. *Lombard Bank* v. *Thorp*, 6 Cow. 46.

Under this law of comity, corporations of other States may hold land in each State, provided their charters give them the competent powers.

The general course of legislation in this State, the long acquience of this State in the exercise of similar powers by corporations of other States, and the judicial decisions of this State, all prove that this law of comity exists in this State, in its utmost extent. *Grafton Bank* v. *Doe et al.*, 19 Vt. 463. *Day* v. *Essex Co. Bank*, 13 Vt. 97. *North Bank* v. *Wood*, 11 Vt. 194. *Bank of Whitehall* v. *Pettes*, 13 Vt. 395. Comp. Stat. 205, § 66.

The same law of comity has been extended towards this State by the other States in the Union, and particularly by New Hampshire; and the courts of this State, in the absence of express legislation upon the subject, should not now, either in the exercise of a sound discretion, or of an absolute power, interfere to annul it.

The opinion of the court was delivered by

REDFIELD, Ch. J. This case has been argued, to some extent, upon both sides, upon the ground of an analogy, or supposed analogy, between the case of land owned by a foreign railroad corporation, and that of lands held by aliens.

I. As a preliminary proposition, we may safely assume, we think, that the escheating of the lands of aliens to the State sovereignty, would be the very last remedy to which they would desire to resort, and that such a resort would only be made to avert some serious impending public calamity. Our titles are all allodial, in fact, if not in form, being a pure and absolute fee simple, and thus transferring an absolute title, which is impossible in England. The escheat of estates to the sovereign, in consequence of a conveyance to an alien, is a result of purely feudal character. It was so held, because an alien, owing a foreign allegiance, was regarded as incapable of performing the feudal military services to the king, as

lord paramount of all the land in the realm. Hence the convey-
ance having carried the title out of the former proprietor, and the
grantee being incapable of taking the estate, it was held to vest in
the king, absolutely, at the death of the first grantee, as an alien
could have no heirs to be invested with his bare possession, which
was all the estate which ever existed in him; and which was al-
ways liable to be divested, at any moment, upon office found, as it
was termed. Now none of these reasons exist in this country.
There is no express prohibition, in the constitution of this State,
against aliens holding real estate. But it has been supposed by
some that there is such an implied prohibition contained in the
thirty-ninth section, in these words,—" Every person of good char-
acter, who comes to settle in this State, having first taken an oath
or affirmation of allegiance to the same, may purchase, or by other
just means, acquire, hold, and transfer lands," &c.

The most, then, which could be claimed in favor of the right to
declare the lands of such as are, in the strictest sense, aliens, es-
cheated to the State, is that such a general implied prohibition
against aliens holding real estate, does exist in the State constitu-
tion. There is no provision in the constitution, or the laws of the
State, for declaring the forfeiture, or taking the escheat of such es-
tates, and confessedly no such attempt has ever been made in the
State, notwithstanding the acknowledged fact, that a large number
of aliens constantly hold large quantities of land in the State. The
most then which could be made out in behalf of such a proceeding,
on the most favorable view, is, that it is *strictissimi juris*, a possi-
ble right of the sovereignty, but one which has always remained
dormant, notwithstanding frequent occasions for its legitimate ex-
ercise.

II. In the next place, it seems to me that the right to interfere
with aliens holding real estate in this country, strictly and appro-
priately belongs to the national, and not to the State sovereignty.
It goes upon the basis of some defect in allegiance; and allegiance
is a matter pertaining altogether to the national sovereignty. They
have the exclusive control of all relations between this country and
foreign nations, or their citizens. And the States are expressly
prohibited, in the United States Constitution, from attempting any
stipulations, treaties or compacts, upon the subject. And the na-
tional government have already assumed to enter into stipulations

with some European nations upon this particular subject.   In
the consular treaty, lately concluded ·between France and the
United States, it is, by the 7th article, stipulated that in all the
States of the Union, whose laws permit, Frenchmen shall enjoy
the right of possessing personal and real estate, by the same title
and in the same manner as citizens of the United States.   And the
President engages to recommend to such States as do not permit
aliens to hold real estate, to pass such laws as may confer the right.
This shows in what light the national sovereignty is disposed to
regard this matter.   Indeed, after proclaiming ourselves the asy-
lum of the oppressed, and the home of the homeless and the deso-
late, it would have certainly an ugly sound to declare aliens inca-
pable of acquiring and holding real estate in time of peace, they
approving themselves peaceable and quiet dwellers upon our shores.
Indeed, I conjecture it would be found, in fact, altogether impracti-
cable to exercise any such power in these States, at the mere option
of the State sovereignty, as is done in England, by what they de-
nominate an inquest of office.   That is the appropriate remedy for
divesting aliens of real estate by way of escheat.   It is a proceed-
ing set on foot by the law officers of the crown, to try either the
title or right of possession, or the extent of the limits of land
claimed by the crown.   It seems originally to have been an *ex
parte* proceeding, for the purpose of investing the king with the
land, and then the subject was put to his petition, or *monstrans de
droit*, as it was termed.   But now, by statutes of 34 Ed. III. chap.
14;  36 Ed. III. chap. 13;  and 2d & 3d Ed. VI. chap. 8, it is
provided that the claimant may traverse the inquest, and thus have
the right determined at once by the jury.   And as this proceeding
is in the nature of criminal procedure, and by consequence, in
this State, the jury must be regarded as having, to some extent, the
right to determine the applicability of such a common law proceed-
ing to our situation and circumstances, it must, I think, be regard-
ed as questionable how far any such procedure could ever be en-
forced, for the mere purpose of escheating to the State the lands
of a quiet resident or non-resident alien, in time of profound peace,
where no danger was apparent, imminent, or even remotely threat-
ened.

   III. Finally, it is not even suggested in argument, that these
corporations are absolutely aliens, owing a natural foreign allegi-

ance. And if they be, as is most probable, citizens of the United States, and thus entitled to all the privileges of citizens of this State, it would be a very remarkable proceeding to escheat their lands to the State, because they claimed to hold the fee in the name of their incorporation in the State of New Hampshire. It should certainly require a decided case of abuse of their legitimate powers, to justify such a proceeding.

IV. But it seems to the court, that this whole subject of the right of aliens to hold land in this State, has but a remote analogy to the usurpations which it is claimed this foreign corporation has perpetrated upon the sovereignty of the State. The right of this court to issue the writ of *quo warranto,* is recognized, in general terms, by our statutes. The occasions are left to be determined by the common law rules. And, by those rules, it is apparent the writ is the appropriate mode in which to try any alleged usurpation of offices, or franchises, inconsistent with the State sovereignty. And that seems to be the purpose of this proceeding.

The allegations in the information are not, that certain persons, without being incorporated, usurp and claim to exercise corporate functions, which is no doubt good ground for filing such information; but, " that there is existing, and doing business in the State of New Hampshire, a corporation, established, constituted and chartered by the laws of said State, by the name," &c., " and that said corporation, without any grant from this State, erected a railroad bridge across Connecticut River, extending its stone abutments into Newbury, in this State, about ten rods, and ever since have occupied and used the same, and claim the right and franchise of so doing." It is further claimed and charged, that this New Hampshire railroad has purchased, in this State, two pieces of land, between the Connecticut River and the Passumpsic railroad, and the fee of another piece, across which the Passumpsic Railroad have already laid their branch road to Connecticut River; and the gravamen of the charge seems to be, " That the Boston, Concord and Montreal Railroad claim to hold said land in fee simple, as the absolute owners thereof; which right of taking, holding, possessing and enjoying the said land and railroad bridge, is a usurpation upon the State of Vermont."

This case having gone to proof, it appears that the Boston, Concord and Montreal Railroad, a corporation extending by its charter

to· the line of this State at Wells River, (and two Vermont rail-roads, by express statute of the State, having permission to unite with that road, or any other New Hampshire road at this point,) have erected a railroad bridge across Connecticut River, and pur-chased some fifteen acres of land adjoining the terminus of their road at the line of this State, which land will be convenient for the use of the company, in doing business at the line of the State, if they should not unite with any Vermont road, and almost indispen-sable if they do so unite. There is no evidence that this corpora-tion have run their cars into this State, or that they purpose to do so, unless they effect an arrangement for a junction with one or more of the Vermont roads; but there is every reason to believe they have no such purpose.

By their charter, it is admitted, this corporation have permission to hold real estate, for the accommodation of their business, greatly exceeding what they now hold. The question then is, whether the having purchased and taken a conveyance of this land, in this State, is to be regarded as any usurpation upon the sovereignty of the State? And it seems to us very obvious, that they have committed no such usurpation, that they have assumed no franchises which are strictly of a prerogative character. By that I mean, such acts as neither natural or artificial persons can exercise without special grant of the legislature. All the functions of a corporation are, in one sense, franchises. The right to hold property in the corporate name, to sue and be sued in that capacity, to have and use a corpo-rate seal, and by that to contract, and some others, perhaps, are franchises, which constitute the very definition of a corporation. And whenever and wherever the corporation is recognized, for any purpose, the existence and exercise of these franchises must also be recognized. But the right to build and run a railroad, and take tolls, or fares, is a franchise of the prerogative character, which no person can legally exercise, without some special grant of the legis-lature. And we should not, of course, be expected to suffer a for-eign railroad to usurp the exercise of any franchises of this charac-ter. This distinction exists in regard to some other classes of cor-porations. It is only the issuing of notes to be the representative of specie, and to form a portion of the currency, and the other lo-cal operations of banking—making discounts and receiving depos-its, and the like—which are of a prerogative character. But there

are many other franchises of foreign banks, and other business corporations, of which it is of daily occurrence to allow the exercise, in every State in the Union. They are allowed to sue and collect their debts, to levy their executions upon land, and take land in payment of debts, when mortgaged, or otherwise. And of all this, no doubt is entertained. Mr. Justice McKinley was the only judge who ever had the boldness to hold the contrary, and his decision was speedily reversed by the Supreme Court.

This point is expressly decided in the State of New Hampshire, in the case of *Lumbard* v. *Aldrich*, (8 N. H. 31,) where it is held that " A corporation, created by the laws of another State, has power to take and hold lands, in this State." PARKER, J., says : " If they may sue, they may satisfy their judgment, by levy upon lands;.and of course hold the land, and convey it. And if they can do this, they may take title by deed, in satisfaction of a debt, by agreement, or upon any other consideration." The same point is decided in *The Silver Lake Bank* v. *North*, (4 Johns. Ch. R. 370,) and in most of the American States. Our own reports are filled with cases in favor of, and against, foreign corporations. *Day* v. *The Essex County Bank*, (13 Vt. 97;) *Grafton Bank* v. *Doe*, (19 Ib. 463 ;) *Claremont Bank* v. *Wood*, (10 Ib. 582 ;) *North Bank* v. *Wood*, (10 Ib. 194;) occur to me, at the moment, and there are doubtless twenty other cases of the kind. All the chartered bridge companies across Connecticut River are of course incorporations, in most cases the charters having been granted by the legislature of New Hampshire ; and it was shown to us, in the trial of this cause, that in very few instances has any grant been obtained from this State. But these bridges, like the railroad bridge in question, must rest at their western termini upon the soil of this State. And all this has been acquiesced in, for fifty years and more. This will not indeed settle the rights of this railroad corporation, by prescription, as their own existence is of a more recent date. But it goes very far, in my apprehension, towards settling the law of the State, in regard to road and bridge corporations in the States conterminous with this State; and especially when corporations have been created in this State, with express permission to unite with this railroad, or any other New Hampshire road at this point, should I regard it as decisive of the right of the New Hampshire corporation to build their road to the very

line of the State, if they could obtain the land for that purpose, without coercive measures. They could not, perhaps, compel the land owners to yield them the right of way, or even space to sustain the western abutment of their bridge, without a grant from the legislature, of the prerogative power to exercise the right of eminent domain over lands in this State.

But, having obtained the permission of the land owners, I should not regard the bringing of their road to the very limits of this State, under the circumstances, as any infringement of the sovereignty of the State, or as any exercise of a prerogative franchise. It is the settled law of England, in regard to aliens even, that if they purchase land by royal license, they may hold it. And in the present case, we could scarcely regard the permission given the Vermont roads by their acts of incorporation, or acts amendatory of such acts, to unite with this or any other New Hampshire roads at the line of the State, at this point, as anything less than an implied permission to the New Hampshire roads to build their superstructure to the very line of the State. And as this line, at this point, is the "westernmost bank of the Connecticut River," the bridge must, of course, in order to bring the rails to the line of the State, rest more or less upon Vermont soil. Allowing them then, no prerogative right to eminent domain in the soil, we cannot regard the long practice of bridge companies across the Connecticut River, the actual licence of the Legislature, and the reason of the case, as justifying any interference with their quiet possession of the land, for the purpose of erecting a bridge, by permission of the owners of the fee of the land, or by means of obtaining the fee in themselves.

The obtaining the fee of some fifteen acres of land in the vicinity of the abutment of this bridge, by the respondents, would doubtless have been regarded as a very harmless operation, by the State sovereignty, and would scarcely have attracted much public notice, had it not been for the rival interests of the Vermont railroads. And it was certainly not improper for them to assert any exclusive claims which they might have, or might suppose they had, in any counter movements made by others. But if the Passumpsic Railroad should unite with the New Hampshire roads at this point, (and as both roads are already in operation to this point, there is nothing to hinder such a union,) and especially if the Montpelier

State *v.* Boston, Concord & Montreal Railroad Co.

road should be ultimately built to this point, thus bringing two New Hampshire and two Vermont roads to a junction, it is not suggested that in such an event, this land would not be useful for the accommodation of the probable prospective business of all these roads at this point.    And as it seems probable that in the event of such a junction, the erections to accommodate the business must probably be upon the Vermont side, to a considerable extent certainly, it is thus made highly desirable to secure this land, no doubt.    And as the New Hampshire roads have a common interest in the matter, we cannot comprehend why they should not have a common right to take early measures to secure the means of their joint accommodation.    We certainly should not feel bound to interfere, to hinder anything which they have thus far attempted.

We take it for granted, from what has been already said, that the respondents are, at present, regarded as holding most, if not all of this fifteen acres, certainly beyond what is indispensable to the accommodation of their legitimate business at the line of the State, as any other proprietor holds land in the State, subject to the public reserved right of eminent domain.    And beyond the actual present necessities of the respondents, if the Vermont roads require any portion of the land held by the respondents, for the necessary accommodation of their own business, they may still take an easement in this land, for such purposes, the same as if it were held by any other proprietor.

It is considered, therefore, that the prosecutor has shown no case requiring the exercise, by this court, of the writ of *quo warranto,* and the information is dismissed.    And as the proceedings have been in the name of the State, no costs can be awarded.