## Crosby *et als. v.* Hanover.

The Court of Common Pleas have jurisdiction of petitions for highways in towns bordering upon adjacent States, where the petitions have been presented to the selectmen of such towns, and refused by them. The fact that the highway prayed for is only a part of one which may be or has been made in the adjoining State, does not affect the jurisdiction.

In the exercise of the power of eminent domain, a part or the whole of the franchise and property of a corporation, however exclusive or ancient the grant, may be taken for the public use, upon suitable compensation being made.

A bridge is a highway; and, upon a petition for the same, a road may be laid out, the termini of which are upon the banks of a river.

Neither selectmen or commissioners have any power to condemn property to public use which is situated in another State.

In the laying out of a highway, the line of a State is, in law, a good terminus.

Where the commissioners of the county laid out a highway, commencing at a terminus in the town of H., which lay upon the Connecticut river, and run across the river to the line of the State of Vermont, and in assessing damages took and condemned the franchise and property of a bridge corporation within the limits of the highway, without taking the entire franchise and property, and also condemned a pier and abutment of a bridge belonging to the corporation, and declared by them to be in Vermont—*Held*, the report to be good, except in the condemnation of the pier and abutment in Vermont.

PETITION for a highway in said Hanover, entered at the October term of the Common Pleas, 1855. The petition sets forth " that there is occasion for, and the public good requires, a new highway in said Hanover, beginning at the westerly end of the highway, in said Hanover, leading from College Plain, so called, by the dwelling-house of Mrs. Susan Brewster, towards Norwich, in the State of Vermont, and extending from said westerly end of said highway, westerly to the easterly line of the State of Vermont, and terminating at or near the westerly end of the toll bridge across Connecticut river, as it was before it was destroyed by fire ; that the selectmen of said town of Hanover have been duly applied to," &c.

The petition was referred to the County Commissioners, who made report in substance as follows : the formal parts of the report being omitted. That after a full and particular hearing of the selectmen of said Hanover, the petitioners, the trustees

of Dartmouth College, the proprietors of the White River Falls Bridge, and all others who wished to be heard, with their several allegations, proofs and arguments, and having fully examined the proposed route, in order to determine the expediency of laying out the highway prayed for, and having duly considered the same, " we are of opinion that a due regard to the public good requires that a public highway be laid out, agreeably to the prayer of said petitioners, and that the burden of making and maintaining the highway prayed for, and of paying damages, should be imposed on said town of Hanover. We therefore lay out a public highway as follows : Commencing at a stake, standing at the westerly end of the highway in said Hanover, leading from College Plain, so called, by the dwelling-house of Mrs. Susan Brewster, towards Norwich, in the State of Vermont, thence N. 69 deg. W., about three hundred and forty-four feet, to the easterly line of the State of Vermont, to a stake standing on said line, near the westerly end of the toll bridge across Connecticut river, as it was before it was destroyed by fire ; said line to be the middle of said highway, and said highway to be four rods wide ; and for that purpose we have taken all the interest, easement and franchise of the proprietors of White River Falls Bridge, a corporation duly established by the laws of the State of New-Hampshire, in and upon or over the land and water where said highway is laid as aforesaid ; being the entire franchise granted by said State of New-Hampshire to said corporation, including all the piers and abutments now remaining and standing, being the entire bridge of said corporation, as incident to said franchise ; the westerly pier and abutment standing within the town of Norwich, in the State of Vermont ; the easterly side of said westerly pier standing very near the easterly line of the State of Vermont ;—and for that purpose we have also taken all the right, title and interest of said corporation in and to a ferry, granted by George the Third to the trustees of Dartmouth College, and by said trustees leased to said corporation, and we have assessed the damages to be paid to said corporation, by said town of Hanover, for their interest, easement and franchise, and

all the abutments and piers as aforesaid, being their entire franchise, granted by said State as aforesaid, and entire bridge now remaining, as incident to said franchise, belonging to said corporation as aforesaid, and all their right, title and interest in and to said ferry, as aforesaid, at the sum of fifteen hundred dollars. We have also taken, for the purpose of said highway, as aforesaid, all the right, title, interest, easement and franchise of the trustees of Dartmouth College in and to a ferry, or the privilege of keeping, using and employing a ferry-boat or boats, for the transportation of men, horses, goods, cattle, carriages, &c., across the river Connecticut, granted to said trustees by George the Third, by the grace of God king of Great Britain, France and Ireland, on the 22d day of June, Anno Domini 1772 ; and have assessed the damages to be paid by said town of Hanover to said trustees of Dartmouth College at the sum of eight hundred thirty-three and one third dollars, for the same. We estimate the expense of making and building said new highway, beside the damages assessed as aforesaid, at the sum of three thousand five hundred dollars."

The following objections were filed to the acceptance of the report :

1. A portion of the bridge, as laid out, is within the limits of the State of Vermont, that is, from the boundary between New-Hampshire and Vermont, at the point of ordinary low water mark, westerly to the " stake standing near the westerly end of the toll-bridge, as it was before it was destroyed by fire," a distance of about seventy-two feet.

2. The commissioners have assumed to take and appraise the franchise of the White River Falls Bridge Corporation, whose charter, granted by the State of New-Hampshire, covers and includes the route and locality of said bridge in New-Hampshire ; and have also assumed to take and appraise the entire bridge of said corporation, a part of which (about seventy-two feet,) is in the State of Vermont, including a pier and abutment belonging to said corporation, and now remaining and standing within the State of Vermont ; which pier and abutment were built and

are owned by said corporation, under a charter from said State of Vermont, now subsisting and in force ; said charter last mentioned covering and including the route and locality of said bridge in Vermont.

3. The commissioners in fact took and appraised the franchise of said corporation in Vermont, which franchise was granted by the State of Vermont, and estimated the same in the assessment of damages to be paid by the town to said corporation, but do not set forth that fact in the report.

4. The point at the easterly line of Vermont, named in the report, is at the westerly bank of Connecticut river at ordinary low water mark, a few feet easterly of said pier in Vermont, and about seventy-two feet easterly of the westerly abutment of the proposed bridge ; and if the bridge should terminate at the easterly line of the State of Vermont, a material part of the whole bridge, and a part without which the bridge would be wholly inaccessible for purposes of travel, and wholly without utility, public or private, would remain to be built in the town of Norwich, in the State of Vermont.

5. There is no road or other way of passage for a distance of about seventy-two feet, between the easterly line of Vermont, on the line of said bridge, and the abutment in Vermont, by which travel could pass to or from said bridge, nor can there be any such road or way of passage except by a continuation of said bridge over said space.

6. There is no road or other mode of passage in Vermont, connecting with said abutment in Vermont, by which travel could pass to or from said bridge for a distance of a number of rods in a westerly direction from said abutment, other than was made by said White River Falls Bridge corporation, and is their exclusive property under said charter.

7. By the laws of Vermont the town of Norwich has no power to take the franchise or other property of said corporation for a highway in any form, and the courts in Vermont have no power to take a part of the franchise, or part of any other prop-

erty of said corporation, for such a purpose, without taking the whole thereof.

8. The bridge proposed, if terminating at the easterly line of Vermont, is a portion of a more extended bridge, partly in the town of Hanover and partly in the town of Norwich, in the State of Vermont, all of which, if any, is necessary for the public accommodation.

9. It is not competent to take the franchise of the White River Falls Bridge corporation, nor of the Dartmouth College ferry, for the purpose nor in the manner proposed in the report.

10. The charter of said bridge corporation in New-Hampshire, having been granted in 1792 and perfected in 1794, neither the town of Hanover nor the court have jurisdiction as to said charter beyond the centre of Connecticut river.

11. The petition, asking for a new highway terminating at or near the westerly end of the toll bridge across Connecticut river, as it was before it was destroyed by fire, it is not competent to lay a road terminating at the easterly line of Vermont, between sixty and seventy feet short of said terminus named.

12. It is not competent, upon the petition, to lay out a bridge merely, and no part a highway, as the report assumed to do, the petition asking only for a new highway.

13. The commissioners did not determine the points in the side lines of the bridge, or highway laid out, where the same crosses the boundary line between the towns of Hanover and Norwich, nor did they in their report establish and describe the same by reference to monuments on the shore of the river, nor in any other definite manner, so that said points may be readily ascertained and known.

The common pleas overruled the objections, and ordered the report of the commissioners to be accepted, and judgment rendered thereon ; to which the defendants excepted, and filed their bill of exceptions, which were allowed by the court.

The evidence referred to will be stated, so far as necessary, in the opinion of the court.

Crosby *v.* Hanover.

*Hibbard* and *Blaisdell*, for the town and corporations.

A road or bridge, laid out without jurisdiction of the subject matter, is a nuisance of common right, to which all persons may object at any time, and which any one may remove. This common right cannot be taken away by any omission of towns or individuals to make the objection at any particular stage of the proceedings. *Arundell* v. *McCulloch*, 10 Mass. 70.

We contend that the court had no jurisdiction over this petition.

As to exception 1st, the facts appear from the petition, the plan, and the report, and from the testimony.

Fixed monuments control courses and distances. *Miller* v. *Silsby*, 8 N. H. 477; *Bowman* v. *Farmer*, 8 N. H. 402; *Knowles' Petition*, 22 N. H. (2 Foster) 361–3; *Newhall* v. *Ireson*, 8 Cush. 595.

The report shows that the bridge was laid out to the stake and stones. The evidence shows where that monument was, that is, seventy-two feet within the State of Vermont. The defendants may explain the record by matter *aliunde*. The record is the sole evidence of the laying out, and cannot be controlled or impeached, except, perhaps, as the foundation of a motion to recommit the report. *Dudley* v. *Butler*, 10 N. H. 281.

The building or maintaining of a road or bridge in one State, by the authorities of another State, would be a prerogative act; an exercise of sovereignty, and could not be admissible, especially when, as in this case, the town have no land or easement in land, in Vermont, on which to make the bridge, nor on which to rest the western abutment in that State, nor any permission, express or implied, from the authorities of Vermont. The town cannot take such land or easement there by appraisal. It cannot exercise the power of eminent domain in a foreign jurisdiction, nor is it perceived how the town could acquire land for such a purpose by purchase. *State* v. *B. C. & M. Railroad*, 25 Vt. 433.

All our toll bridge corporations are so constituted that they can take private property only by purchase. A similar provi-

sion appears in the charter of the White River Falls bridge corporation. There never has been in the State a free bridge across Connecticut river. It is reasonable to believe that this fact is the result of former consideration of the difficulties sup-posed to exist in this case. The great expense which the success of this application would impose upon the towns in this State lying on the Connecticut river, as a precedent for a policy by which those towns would ultimately be compelled to bridge the river for its whole extent within our limits, for the equal benefit of the people of Vermont, is submitted as a matter proper to be weighed in determining some of the questions here involved.

·*Exception 2, in connection with exceptions 3, 4, 5, 6, 7 and 8.* The taking of the franchise, pier and abutment, in Vermont, ap-pears from the report. It was an assumption of the power of eminent domain in that State. Such acts can be done only by the authorities of that State, by virtue of the laws thereof. *State* v. *B. C. & M. Railroad,* 25 Vt. 433; *Heard* v. *Ins. Co.,* 1 Curtis 459; *West River Bridge Co.* v. *Dix,* 16 Curtis 800; *Plate Manufacturers* v. *Meredith,* 4 D. & E. 794. The bridge would be wholly useless unless extended into Vermont, and there is no public way to meet it there. This is apparent from the whole case, and is to be inferred from the report itself, and is a sufficient objection to the laying out. *State* v. *Canterbury,* 28 N. H. (8 Foster) 195, 225; ·*Griffin's Petition,* 27 N. H. (7 Foster) 343.

There is no power to condemn private property, except for a public use, even for compensation. It cannot be taken when the result would be destruction merely, nor where the utility is doubtful or contingent, and the necessity not urgent. U. S. Constitution, art. 5; N. H. Bill of Rights, art. 12; *Backus* v. *Lebanon,* 11 N. H. 24, 25.

The powers mentioned in the 7th exception do not exist in Vermont. But waiving the question of power in Vermont, will the court order Hanover to build this bridge, when its whole utility must depend upon the contingency, doubtful at least, that the authorities in Vermont will decide to exercise their power,

and meet our bridge with a similar structure, which, when erected, they may discontinue at their option ?

The franchise of the part of the old bridge in Vermont must be taken to have been held under the charter granted by that State. The corporation is to be deemed, for this purpose, a citizen of the State from which it has its charter. *Marshall* v. *Balt. and Ohio Railroad*, 21 Curtis 153.

*Exception* 9. It was not necessary for the purposes of the bridge to take the entire franchise of the ferry. The ferry might be used at other places within the limits of its charter, notwithstanding the bridge. *Charles River Bridge* v. *Warren Bridge*, 12 Curtis 496 ; *Piscataqua Bridge* v. *N. H. Bridge*, 7 N. H. 35–60.

*Exception* 10. The jurisdictional line of Hanover, as to the White River Falls bridge corporation, does not extend beyond the east bank of Connecticut river ; or at the farthest not beyond the centre of the stream. *State* v. *Gilmanton*, 9 N. H. 461 ; *Claremont* v. *Carleton*, 2 N. H. 369 ; *State* v. *Canterbury*, 28 N. H. (8 Foster) 195.

The statute of 1795, extending the western boundary of towns on the Connecticut river to the west bank, was passed after the charter was granted, with a saving from the effect of the act of all bridges, islands and ferries before granted, which saving has since been preserved. N. H. Statutes, ed. of 1805, p. 204 ; *vide* Preamble of said Act ; Pamphlet Laws of 1834, p. 166 ; Rev. Stat., chap. 37, p. 100, sec. 1 ; Rev. Stat., p. 475, secs. 3, 5.

With or without the saving clauses, the legislature would have no power to impair the charter by subjecting it to the jurisdiction of the town. The charter was without reservation. *Dart. College* v. *Woodward*, 4 Curtis 463 ; *West River Bridge* v. *Dix*, 16 Curtis 800. The original application, covering land not in any town, should have been to the Court of Common Pleas, if any where. Comp. Stat., 137, sec. 2.

*Exception* 11. The petition must state the termini ; 81st Rule of Court ; and the laying out must conform to the petition.

*Raymond* v. *Griffin*, 23 N. H. (3 Foster) 340–5; *Cole* v. *Canaan*, 29 N. H. (9 Foster) 88.

*Exception* 12. *Vide State* v. *Canterbury*, 28 N. H. (8 Foster) 228.

*Exception* 13. Comp. Stat., 140, sec. 10.

*Weeks, Quincy,* and *C. R. Morrison,* for the petitioners, took the following positions:

1. We say that exception No. 1 is not founded on fact. The evidence does not so show.

2. That portion of exception No. 2 which is as follows: " which pier and abutment was built and owned by said corporation, under a charter from said State of Vermont, now subsisting and in force," is not founded on fact. There is no evidence of an organization under the Vermont charter. The corporation could exercise all the rights and power which they have assumed to exercise under the New-Hampshire charter, without any charter from Vermont. *State* v. *B., C. & M. R. R.* 25 Vt. 433.

3. Exception No. 3 is not founded on fact.

4. The objections contained in exceptions No. 4, 5, 6, 7, 8, 10, 11 and 12, are made too late, and cannot now be considered, and the testimony referred to in the bill of exceptions in their support, should be rejected. *White* v. *Landaff*, 35 N. H. 128.

5. As to exception No. 9, we say that it is competent to take the franchises of the White River Falls bridge corporation and Dartmouth College Ferry in the manner proposed. *State* v. *Boscawen*, 28 N. H (8 Foster) 195, 222.

6. *Exception* 10. We contend that the town of Hanover and the court have jurisdiction to the west bank of Connecticut river, in addition to the position that it is now too late to take that exception. Rev. Stat., chap. 39 ; Comp. Stat., chap. 39 ; Edition of Laws of 1805, 204.

7. As to exception 13, we say that there is no law requiring commissioners to determine the points on the side lines of the bridge. 24 Pick. 343.

EASTMAN, J. This petition is for a highway in the town of Hanover. It was first presented to the selectmen of the town, and, upon their refusal to lay out the road, it was presented to the Common Pleas, and by that court referred to the commissioners of the county.

The highway petitioned for begins at the westerly end of a highway in Hanover, and terminates at the easterly line of the State of Vermont, at or near the westerly end of the toll-bridge across Connecticut river, as it was before it was destroyed by fire. These termini are within the limits of the State and of the town; this State being bounded westerly by the west bank of the Connecticut and the State of Vermont, and the town having for its western boundary the same line.

Originally the Province of New-Hampshire was regarded by the authorities who made the grants as embracing the territory now constituting the State of Vermont. Both sides of the Connecticut were granted about the same time. By a subsequent decision of the sovereign in England, New-Hampshire was limited to the west bank of the Connecticut; and by the statute which is now in force, and which has been for a series of years, the northerly and southerly lines of the towns adjoining the Connecticut river are extended across the river, to the westerly line of the State, and the west line of the State is declared to be the western boundary of the towns. Rev. Stat., chap. 37, sec. 1.

Over the limits and boundaries of towns the legislature have entire control, and any change in those limits is binding at once. *State* v. *Canterbury*, 28 N. H. (8 Foster) 218; *Bristol* v. *New-Chester*, 3 N. H. 524.

Such change is territorial merely, and does not of course affect any rights in private property; so that, whatever may be the rights of individuals owning lands upon the river or islands in the river, or however the lines of the towns may have been originally, the State, extending to the western bank, and the legislature having bounded the towns upon the river by the same line, the western boundary of Hanover is the eastern line

of Vermont, and the western bank of the river. Consequently, the termini of the petition are within the limits of the town, as established by law; the eastern terminus being the end of a road in the town, and the western one being the eastern line of Vermont, which is the western line of the town.

The statement in the petition that the western terminus is at or near the westerly end of the toll bridge, as it was before it was destroyed by fire, is merely descriptive of the place where the line of the State is. It is the line of the State which is fixed as the terminus, and that is described as at or near the westerly end of the toll bridge.

The petition, therefore, having been for a highway within the town, and having been refused by the selectmen, was properly presented to the Common Pleas, and of it that court had jurisdiction. Rev. Stat., chap. 50, sec. 1.

The question of the jurisdiction of the court over this petition is not embarrassed, as counsel have urged, by the decision in *Griffin's Petition*, 27 N. H. (7 Foster) 343. In that case the petition was for a highway in Hudson, and stated that it was a part of a more extended highway required by the public good to be laid out over lands in Hudson and Londonderry, two adjoining towns. The petition, having been first presented to the selectmen of Hudson, and declined by them, was afterwards presented to the Common Pleas ; and it was *held,* that selectmen have no authority to lay a highway in their town, where such highway forms but a part of a highway extending into another town, the whole of which, if any, is required for the public accommodation; and hence, that a petition to the Court of Common Pleas, founded on the refusal of the selectmen to lay such part of a road, cannot be sustained ; that, the jurisdiction of the Common Pleas depending upon the action of the selectmen, and the petition itself showing that they had no power to act, there was no foundation upon which the jurisdiction of the court could rest.

The power to lay out highways from town to town is given exclusively to the court of Common Pleas, and selectmen have no

Crosby v. Hanover.

jurisdiction as to those parts of such highways as lie within their limits. The commissioners of the county, who have the wants of the public and the interests of the several towns before them at one and the same time, are to be the judges of the propriety of laying out a highway which is to be made by two or more towns, and not the selectmen of any one town; and applications in such cases are to be made in the first instance directly to the court, and the petitions referred to the commissioners, as provided by statute. Such is the doctrine of Griffin's Case.

But the facts in that case are not parallel with those of the present. This petition is for a highway in one town only. It is not for a part of a more extended highway, leading from town to town within the limits of this State, as was the case in Griffin's Petition. This application shows no such fact, and the evidence furnished does not show it. There is no town beyond Hanover on the west in this State in which a road could be established by our authorities. When we pass over the west line of Hanover we go at once into Vermont, where we have no jurisdiction whatever. And although this highway may be connected with another which has been made in that State, or which may hereafter be made, yet it cannot, in any proper sense, be said to be a road from town to town, or in two or more towns, as the terms are used in our statute. Beyond doubt, those terms refer to towns within our own limits.

If the court cannot obtain jurisdiction of this case by the presentation of the petition to the selectmen, and their neglect or refusal to act, then they can have jurisdiction of no case in a town bordering upon an adjoining State, where the highway is a part of one running into such State. Take the towns lying upon the borders of Massachusetts and Maine, where there are no natural boundaries between the States, but the roads run from one State into the other, in the same manner as though the adjoining towns in the respective States were in the interior of this State, it is manifest that the only way in which such roads can be legally laid out in this State, is, first, to present the petitions to the selectmen, and then, if they refuse, to bring them before

the court.   When the legislature and court say that petitions for
highways from town to town, or in two or more towns, shall be
presented directly to the court in the first instance, they undoubt-
edly mean and must be understood to speak of towns within our
own limits ; and petitions for roads bordering on other States,
although a continuation of the same would extend into those
States, are within the jurisdiction of the selectmen to entertain ;
for they ask for roads in one town only ; and there is no occa-
sion for further legislation, as is suggested by counsel, to reach
such cases.

Whether any road exists in Vermont, connected with the one
described in this petition ; or, if not, whether any will be made,
is immaterial in the present position of the case.   It does not
affect the jurisdiction of the court over the petition.   Such fact
would be material and proper for the consideration of the com-
missioners upon the question of the public exigencies, and whether
the road should be laid out ; but it is not a matter that can be
considered by the court.

We have no hesitancy, therefore, in holding that the Common
Pleas had jurisdiction of this petition, and that they acted legally
in referring it to the commissioners of the county.

The commissioners, in their report, lay out the highway with
substantially the same termini as those stated in the petition.
They commence at a stake at the end of a highway in Hanover,
" thence north, sixty-nine degrees west, about three hundred
and forty-four feet, to the easterly line of the State of Vermont,
to a stake standing on said line, near the westerly end of the
toll bridge across Connecticut river, as it was before it was
destroyed by fire."   This is a location that can readily be ascer-
tained, and is within the limits of the town of Hanover.   There
is no controversy about the eastern terminus.   Commencing at
that terminus, and running north, sixty-nine degrees west, to the
line of Vermont, and the exact centre line and length of the
road are found.   The commissioners do not attempt to give the
precise length of the road.   They say that it is *about* three
hundred and forty-four feet, and that is sufficiently exact.

Neither do they attempt to fix the western terminus with precision by any permanent monument put up by them. They run " to the easterly line of the State of Vermont, to a stake standing *on said line, near* the westerly end of the bridge ;" following the language of the petition. They do not run to the end of the bridge, nor to any permanently visible monument ; for a stake is but a temporary monument, and oftentimes in a description only an imaginary one ; but they go to the line of the State, which in law is a good boundary, and must be presumed to be known.

It was not necessary for the commissioners to determine the points in the side lines of the highway, as set forth in the exception. They give the centre of the road, and the width, and that is all that is ordinarily required. It is only where the highway laid out is from town to town, and crosses a river in this State which is the boundary between the towns, that it is necessary for the commissioners to fix any points in the side lines. In such cases they are required to determine the points, in order to settle where the boundary line is between the towns upon the river, and their decision, for the purposes of making the bridge by the adjoining towns, is final. Comp. Stat., chap. 54, sec. 10. This not being a road from town to town in this State, the statute does not apply.

The easterly line of the State of Vermont is a controlling boundary, good in law, which cannot be affected by any monuments that may be put up beyond the line, either by the commissioners, or others, nor in any way. To that line, and no further, does the report establish the road. The commissioners do not assume to go beyond that line ; and if, either by mistake or otherwise, they should lay the road beyond it, their doings to that extent would be a mere nullity. The town, in case of the acceptance of the report, would be bound to make the road to that line, and no further. They would be governed by the record of the laying out, which fixes it at that point, and which could not be contradicted. *Dudley* v. *Butler,* 10 N. H. 281 ; *State* v. *Boscawen,* 28 N. H. (8 Foster) 195.

We have not omitted carefully to examine all the evidence that has been laid before the court, as tending to show the location of this road; and our opinion is, that it does not show a location different from that stated in the report, or that the commissioners, in fixing the western terminus, have gone beyond the limits of the town. The western abutment of the bridge is, by their report, confessedly in Vermont. The commissioners so state in assessing the damages. The stake spoken of in the report is described as on the line of the State near the abutment, about three hundred and forty-four feet from the eastern terminus, while that which was placed *upon* the abutment was some eighty feet beyond. It was not the terminus of the highway, nor intended to be, but was merely a signal to give the direction of the line in running across the river. The evidence does not show that the commissioners have attempted to go beyond the line of the State, or that the road is laid out beyond that line.

The highway which is laid out by the report of the commissioners consists mainly of a bridge across the river, and it is objected that it is not competent, on such a petition, to lay out a bridge merely. But this exception is not well taken. Selectmen and commissioners have the same power to lay out highways over streams of water not navigable, that they have to lay them out upon the land; and upon such laying out the towns are obliged by law to make bridges, suitable and safe for the public travel. Bridges are highways as much as other sections of a road, and it is immaterial what the width of the streams may be, so far as the legal liability of the towns is to be considered. Rev. Stat., chap. 49, sec. 10; *State* v. *Canterbury,* 28 N. H. (8 Foster) 195. The word "highway," or road, is declared by statute to include all bridges thereon. Rev. Stat., chap. 1, sec. 21.

Whether the public good requires that a town shall be put to the expense of making and maintaining a bridge across a river, is often times an important consideration, and one that should be well examined; and it is no doubt such in the present instance. But that is a question of fact, which the commissioners alone are

to settle, and it is not open for revision by the court. *Hampstead's Petition*, 19 N. H. 343. The views which are so well expressed by counsel upon this point, as indeed upon all the others, would be worthy of much consideration by the commissioners, but the question cannot be passed upon by us.

So also in regard to the practicability of making the bridge at the Vermont line; that is not a question for us to consider or determine. It lies wholly with the commissioners; and all evidence in regard to it is immaterial on the question of the acceptance of the report. Towns extending to the centre of a river are liable to indictment for neglecting to build that part of a bridge which is within their limits. It was so held in *State* v. *Boscawen*, where the bridge that was required to be built was across the Merrimack. And in England, if the part of a bridge is in one county, and the other part in another county, each county is bound to repair that part which is within its limits. 3 Chitt. Cr. Law 595; Arch. Cr. Pld. 375. There would seem to be quite as much impracticability in building a bridge to the centre of a river, like the Merrimack, as to the line of Vermont at the west branch of the Connecticut. But, as before suggested, this is a matter of fact, of which the commissioners alone are to judge.

The commissioners, then, have laid out a highway in the town, which they had the power to lay, and upon a petition of which the court had jurisdiction. Their report substantially conforms to the petition in the location of the highway, and they have not exceeded their jurisdiction in laying it. Their report shows that they have not gone beyond the line of the State or of the town; and within the limits of the town they had the power to act. If, therefore, there has been no error in the taking of property for the purposes of the highway or bridge, and in the assessment of damages, the judgment of the court, accepting the report, may be affirmed.

In laying out this highway the commissioners have taken the franchise of the White River Falls bridge corporation, and of the Dartmouth College ferry, so far as existing within the limits

of the road, and it is objected that they could not be taken for the purposes nor in the manner proposed.

It must be regarded as settled in this State, that in the exercise of the power of eminent domain, any real estate, property, franchise, or easement of any corporation, however exclusive the grant, may be taken for public use, provided suitable compensation be made ; and whenever property is taken for a highway, it is for the public use. This question has been so elaborately discussed in several cases in our own Reports, that it is unnecessary to repeat the discussion here. *Piscataqua Bridge* v. *N. H. Bridge*, 7 N. H. 35 ; *Brewster* v. *Hough*, 10 N. H. 138 ; *Backus & al.* v. *Lebanon*, 11 N. H. 19 ; *Northern Railroad* v. *Concord and Claremont R. R.*, 27 N. H. (7 Foster) 183.

And by the 11th section of chapter 49, Rev. Stat., it is provided that any real estate, franchise, or easement of any corporation, may be taken for a highway, in the same manner as the real estate of individuals ; and the selectmen of towns, or the commissioners of the county, as the case may be, are to assess the damages. Rev. Stat., chap. 49, sec. 11 ; chap. 51, sec. 7. In *State* v. *Canterbury*, already cited, the franchise of the corporation and the bridge itself were taken, and damages assessed and the report was sustained.

Of the power, therefore, to take the franchise and property of the White River Falls bridge and of the ferry, for public purposes, and for the making of a bridge across the Connecticut at the place where the commissioners have laid out this highway, we entertain no doubt. Neither their antiquity nor their exclusive privileges can shield them from subjection to the power of eminent domain, as understood and repeatedly explained by the courts of this State. This power cannot of course be carried to the extent to take the franchise of a foreign corporation, and we do not understand from the report that the commissioners have attempted to do it. They take the franchise of the corporation " established by the laws of the State of New-Hampshire," and no other ; and all the property pertaining to the same, situated within the limits of the highway laid out by them ;

and all the piers and abutments belonging to the bridge, including the pier and abutment stated by the report to be within the town of Norwich, in the State of Vermont.

In doing this they have not exceeded their powers, unless it be in condemning the pier and abutment in Vermont. The report is perhaps a little ambiguous in describing the manner in which the franchise and property of the corporations are taken ; and counsel have contended that by it the entire franchise of the bridge corporation is taken, while some of its property is not condemned ; thus leaving property, but no franchise or right by which the corporation can hold it — the toll house, for instance. The court do not so understand the report ; but, as we construe it, the commissioners intended to take the franchise and property of the corporations, as they exist *within the limits of the proposed highway*, and not otherwise ; that is, whatever franchise or right the corporations had, either of making a bridge or maintaining a ferry at the place and within the limits of the highway laid out, were taken by the commissioners, and also such piers and abutments as were there found, together with the land under the river, but nothing further. And to such a course there is no legal objection under the practice and decisions in this State. Portions of turnpikes have been taken for public highways, and the franchises of the corporations to that extent also taken, without condemning the whole. It has likewise been held that a part of the track of a railroad may be taken for the use of another railroad, if the public good require it. *Northern Railroad* v. *Concord & Claremont Railroad*, 27 N. H. (7 Foster) 183 ; and *Parker*, C. J., in *Piscataqua Bridge* v. *New-Hampshire Bridge*, 7 N. H. 67, speaks of taking " a portion" of a bridge. Because the right of building a bridge in the place designated by the commissioners, and the property there found, are condemned to the public use, the acts of incorporation granted to the bridge and ferry companies are not thereby taken away. All their rights and all their property, existing outside of the limits of the proposed highway, remain to them unimpaired, and they may exercise such rights and dispose of such

property as they may see fit. The entire franchises of the corporations are not taken, nor their entire property, and the laws of this State do not require that they should be. There is, therefore, no valid objection to the report upon this ground, although it might be more clearly and definitely expressed.

Upon the question of condemning the pier and abutment in Vermont, counsel upon both sides have cited the case of *State* v. *The Boston, Concord & Montreal Railroad*, 25 Vt. 433, as sustaining their views. In that case it was decided that the railroad, which has a charter in this State, extending across the Connecticut to the line of Vermont, might purchase and hold land in that State upon which to build the western abutment of their bridge, and also other land adjoining, to accommodate their business; and that in having made a purchase they had assumed no franchises of a prerogative character, and had committed no acts which natural or artificial persons might not do without a grant from the legislature. In the course of the opinion, *Redfield*, C. J., said that the bridge corporations across the river were in most instances charters obtained from the legislature of New-Hampshire; that these bridges, like the railroad bridge in question, must rest, at their western termini, upon the soil of Vermont; that this had been acquiesced in for fifty years or more, and that it went very far in his opinion towards settling the law in regard to road and bridge corporations in the States conterminous with Vermont: that they could not, perhaps, compel the land-owners to yield the right of way, or even space to sustain the western abutment of the bridge, without a grant from the legislature of the prerogative power to exercise the right of eminent domain over lands in Vermont; but, having obtained the permission of the land-owners, it might be done.

That case settles the point that a railroad or bridge corporation, chartered in this State, with the line of Vermont as its western terminus, may build a bridge across the Connecticut river, with its western abutment on Vermont soil, provided the permission of the land-owners can be obtained. And if a railroad or bridge corporation can thus place the western abutment of a

bridge upon the soil of that State, there would seem to be no good reason why a town might not also build an abutment there, if they found it necessary, or more convenient or economical, and could obtain the land on which to build it.

. The case, however, does not go to the extent to authorize property within that State to be taken and condemned, by any power, without an act of the legislature therefor. In the absence of such an act, property there situated can only be obtained by purchase, or in some of the ways known to the law, by which it may pass from one person to another. Our courts and the officers of our laws have no jurisdiction as such to do any act or take any property in that State. Our official powers are confined to the limits of our own State, and the court in this case cannot require or authorize the town to go into Vermont to take the property of the corporation there, and the commissioners had no power to condemn property situated in that State. They could take the franchise of the corporation, because that exists in this State, and by its laws ; and they could take all the property in this State necessary for the purposes of building the bridge ; but they had no jurisdiction or power beyond the limits of the State. The western abutment and pier are stated in the report to be in Vermont, and we take such to be the fact. They are visible, tangible property there, and they cannot be condemned or taken in that State by the action of our commissioners here, or by force of any decree of our courts.

As, however, this pier and abutment would appear to be of little or no value to the corporation, after parting with the franchise and other property where the highway is laid out, it would be competent for the commissioners, in making their assessment of damages, to take into consideration this fact, and to increase the damages accordingly, if they thought proper.

We have discussed these various questions as though the exceptions had all been seasonably taken, that the whole merits of the petition might be examined ; but we do not intend by this to have it understood that the court have changed their views, as expressed in *White* v. *Landaff*, and other similar decisions.

There are one or two other questions presented by the exceptions, but they have not been pressed in the argument, and upon examination they do not appear to require discussion.

The result, then, to which we have arrived is : That the exceptions should all be overruled except the one which relates to the condemnation of the pier and abutment in Vermont. To correct that error, the judgment of the Common Pleas accepting the report, must be vacated, and the report be specially recommitted to the commissioners, for amendment in that particular. We think also that it would be well to have the report state more clearly the manner and extent of the condemnation of the franchises and property of the corporations, so that the report should be relieved from ambiguity in this respect. Upon a recommitment these amendments can be made at once, and the report be then accepted, and judgment entered thereon.

*Judgment vacated, and report recommitted specially.*