BOSTON AND PROVIDENCE RAILROAD CORPORATION *et al.*
*vs.* NEW YORK AND NEW ENGLAND RAILROAD COMPANY
*et als.*

The H., P. & F. R. R. Co., a Rhode Island corporation, executed in 1863, an agreement and lease to the B., H. & E. R. R. Co., a Connecticut corporation, whereby all the property and business of the former was transferred, *in perpetuum*, to the latter, the stockholders of the former to be remunerated by receiving stock in the latter, or by receiving a fixed price per share in money. This transfer was ratified by the Legislature of Rhode Island in 1865. In 1866 the B., H. & E. R. R. Co. mortgaged its road. It subsequently became bankrupt, and was dissolved by a decree in Connecticut in 1873. The mortgagees foreclosed by equity proceedings in Rhode Island in 1875, and formed the N. Y. & N. E. R. R. Co., into whose possession the road passed by deeds from the mortgage trustees and from the assignees of the B., H. & E. R. R. Co.

In December, 1875, certain stockholders of the H., P. & F. R. R. Co. filed in Rhode Island a bill in equity to set aside the agreement and lease to the B., H. & E. R. R. Co., and to redeem the H., P. & F. R. R. from the mortgages executed by the B., H. & E. R. R. Co., alleging that the agreement and lease were *ultra vires*, that they were obtained by fraud, and that they were subject to certain conditions precedent, which had not been fulfilled.

*Held*, that the agreement and lease were *ultra vires* and violated the rights of the dissenting minority of the stockholders of the H., P. & F. R. R. Co.

*Held*, further, on the evidence produced that the fraudulent representations charged against the B., H. & E. R. R. Co. in the matter of the agreement and lease were not satisfactorily proven.

*Held*, further, that certain provisions in the agreement relative to the cost of purchasing and completing another road, to the stock subscriptions of the B., H. & E. R. R. Co., and to the issue and transfer of stock to trustees, could not be considered conditions precedent to the transfer.

*Held*, further, that the complainants, by their delay in beginning legal proceedings, and by allowing the intervention of other equities, were precluded from relief.

*Held*, further, that the N. Y. & N. E. R. R. Co. derived its title from the mortgage, not from the deed given by the mortgage trustees, and was not affected by a clause in the decree of foreclosure reserving the "rights of any person or corporation claiming to hold stock, whether common or preferred, in the H., P. & F. R. R. Co., or of any person or corporation not a party to this suit."

*Held*, further, that the bill must be dismissed.

POTTER, J., dissenting.

BILL IN EQUITY, to set aside certain conveyances and to redeem.

After the proceedings in this case reported in 12 R. I. 220, the cause came on for hearing upon its merits, on bill, answers, exhibits, depositions, and oral testimony adduced; before POTTER, MATTESON, and STINESS, JJ., May 20, 21, 22, and 24, 1880.

*March* 12, 1881. STINESS, J. The two principal questions in this case are : first, Whether the sale of the Hartford, Providence,

and Fishkill Railroad to the Boston, Hartford, and Erie Railroad Company was illegal; and secondly, if so, whether the complainants are still entitled to enforce their rights against the defendants, whose title is founded upon that sale.

The complainants claim that the sale was void because it was beyond the power of the corporation to make it, and also by reason of false and fraudulent representations, and of certain conditions precedent to the transfer of the title which were not performed.

Was the sale *ultra vires ?*

That a corporation, as a creature of the legislature, can possess and exercise " no other powers than those specially conferred by the act creating it, or such as are incidental or necessary to carry into effect the purposes for which it was created ," *Caldwell* v. *City of Alton,* 33 Ill. 416, 418; that it cannot of its own motion absolve itself from its obligations by transferring its franchise to another; *Thomas* v. *Railroad Company,* 11 Otto, 71; and that it cannot by a vote of a majority of the stockholders arbitrarily deprive a minority of their interest in its property and practical existence, *Kean* v. *Johnson,* 9 N. J. Eq. 413, are propositions too plain to be disputed.

It is apparent from the record in this case that the Hartford, Providence, and Fishkill Railroad Company had no authority, at the time when the contract was made, to sell or to lease to the Boston, Hartford, and Erie Railroad Company; that the agreement of sale, by transferring all the property and business of the corporation, was a practical abandonment of the charter and dissolution of the company; and that this was done by a vote which, if valid, compelled all stockholders to accept stock in another company in lieu of that in the Hartford, Providence, and Fishkill Railroad Company, or a fixed and arbitrary sum for such stock, which after the sale of the road could have no value except under this agreement.

Certainly up to this point the transaction was *ultra vires,* both from the lack of legislative authority, and from the unwarrantable manner of undertaking to dispose of the rights and property of non-consenting stockholders.

But the transfer and sale by the.corporation were ratified and

confirmed by the General Assembly of this State, March 2, 1865, and we have therefore to consider the effect of this action.

The Boston, Hartford, and Erie Railroad Company was chartered by the State of Connecticut, and was not a Rhode Island corporation, except so far as it became, by virtue of the sale and the action of the legislature, the successor of the Hartford, Providence, and Fishkill Railroad Company.

Yet as a foreign corporation it might be empowered to own and operate a railroad within this State, the policy of such authority being wholly within the discretion of the legislature. *State* v. *Boston, Concord & Montreal R. R. Co.* 25 Vt. 433 ; *In the Matter of Townsend,* 39 N. Y. 171 ; *Stewart* v. *Lehigh Valley R. R. Co.* 38 N. J. Law, 505 ; *Thompson* v. *Waters,* 25 Mich. 214 ; *Hall et al.* v. *The Sullivan Railway,* 21 Law Reporter, 138 ; 2 Redfield Amer. Railway Cases, p. 621.

But the Boston, Hartford, and Erie Railroad Company can hardly be regarded as a foreign corporation. True it was not a Rhode Island corporation in the sense that it was chartered here ; but it was subject to Rhode Island laws and control as fully as a domestic railroad company. Its petition for confirmation of the sale was that it might " hold and enjoy said property and franchises by them purchased, subject to the charter of said Hartford, Providence, and Fishkill Railroad Company and the general law of this State ; " and the act of the General Assembly provided that it might have and enjoy " all the rights, privileges, and powers heretofore granted to the Hartford, Providence, and Fishkill Railroad Company, and be subject to all the duties and liabilities imposed upon the same by its charter and the general laws of the State."

After this legislative action, therefore, the Boston, Hartford, and Erie Railroad Company was successor to the franchise of the Hartford, Providence, and Fishkill Railroad Company, with no new nor greater powers, and subject to the same obligations and control. It was thenceforth a corporation in this State, though not of this State. *Chicago & W. I. R. R. Co.* v. *Lake Shore & M. S. R. R. Co.* 11 Reporter, 323, issue of March 9, 1881.

Hence, whether it was a foreign or *quasi* domestic corporation the grant of corporate rights and privileges to it was within the

power of the legislature, and to that extent, at least, the confirmation of the sale was valid and effectual.

But the sale was of the whole business and property of the Hartford, Providence, and Fishkill Railroad Company. After it, nothing remained to them but the mere franchise to exist as a corporation. It was not an extension of business or engaging in a new enterprise by the company; everything of value and utility was sold; and that not for a sum to be divided proportionately among all the stockholders, but under an arrangement by which the minority were told that they could either take stock in the Boston, Hartford, and Erie Company, or money, on a fixed basis, not agreed to by them, or they would get nothing.

Such an arbitrary deprivation of property it cannot be within the power of a majority in a corporation to direct or of a legislature to ratify. If this could be upheld no investment in a corporation would be secure, for any minority could be deprived of their property by a vote of a majority confirmed by legislative act, without the requirement of public necessity and without provision for "just compensation." *Lauman* v. *The Lebanon Valley R. R. Co.* 30 Pa. St. 42.

We do not say that there may not be cases where a majority of stockholders may lawfully vote to sell all the company's property and surrender their charter; *e. g.* "where the purpose of the incorporation could not be accomplished; the business contemplated could not be carried on; where the capital had been exhausted in endeavors to go on, leaving no means to go further," &c. *Wilson* v. *Proprietors of Central Bridge,* 9 R. I. 590, 598.

But such is not this case. Though we may well assume that the Hartford, Providence, and Fishkill Company was embarrassed from the fact that the road was in the hands of trustees for default in the payment of interest due on its mortgages, and from testimony that its stock was selling for a nominal sum, yet the sale does not purport to be made by reason of the financial exhaustion of the company, but for the purpose of promoting the extension of the road, not in this State, but "so as to connect it with the Erie Railroad at Fishkill on the west."

It is urged, however, that though the arrangement partook of

this arbitrary character, the complainants were not injured by the transaction because they were to be paid ten times what their stock was worth at the time of the sale.   Perhaps they were, but if so, it was an act of such pure and unusual generosity that it is not at all strange that we cannot quite satisfy ourselves upon that point.   Calvin Day, the president of the Hartford, Providence, and Fishkill Railroad Company, testifies: " The argument of the gentlemen representing the Boston, Hartford, and Erie Railroad Company was, that having obtained the road from Waterbury to Boston and Providence *at so low a price, in comparison with its cost or value*, the consolidated property would be sufficient to enable the company to float bonds at a reasonable price," sufficient to complete the road to Fishkill; " and in pursuance of that they subsequently issued $20,000,000 of bonds."

True, the importance of this testimony as showing the real value of the property is somewhat impaired by the subsequent remark of the witness in regard to those bonds, that " there was a great crop of fools at that time," but it nevertheless leads us to believe that there was an apparent value in excess of the stock and money to be given for it 'which the owners were at least entitled to ascertain and be paid for.

Upon the facts before us, therefore, we cannot doubt that this sale would have been set aside, or in some way reformed, upon a seasonable and proper showing by the non-consenting stockholders.   They were then in part the owners of the road.   The fact that it was in the hands of trustees could not have affected their right to be heard before the court as to its permanent alienation :   they had a clear interest in the affairs of the company, in its property and existence ; and though they could not have brought this bill to redeem the mortgages not then due, they could have objected to and settled the validity of the sale which disposed of all the corporate property and business, and thereby have determined the real question in this case before the rights of other parties had intervened.   We think they should have done so.   The question in this case is not whether the complainants have been negligent in seeking to redeem the mortgages, but in objecting to the sale, on the rescission of which their right to redeem depends.   It is admitted that they knew of the sale

and the terms on which it was made.   Nearly three years after-wards the Boston, Hartford, and Erie Railroad Company proposed to raise money by the Berdell mortgage, so called.   Those who desired to take the bonds found that company claiming the own-ership of the Hartford, Providence, and Fishkill Railroad, under the deed given pursuant to the contract of August 28, 1863, which was recorded in the land records of the city of Providence in De-cember, 1863 ; that no one had made any question of the legality and validity of that sale ; that it was acquiesced in, at least by their silence, by the stockholders of the Hartford, Providence, and Fishkill Railroad Company ; that it was ratified and confirmed by the General Assembly of this State after ample notice and oppor-tunity to object to it ; that the mortgage itself was also allowed and confirmed by the legislature, so far as appears, without oppo-sition ; that the Hartford, Providence, and Fishkill Railroad Com-pany had ceased to hold corporate meetings, and had virtually passed out of existence — and, with these facts before them, they took the bonds under that mortgage.

Right here is the decisive point in this case, for upon that mort-gage the defendants' title rests.   We think that under these cir-cumstances the complainants are equitably estopped from claiming that the sale should be set aside.

It is a well settled rule of law that where an unauthorized sale of property is expressly or impliedly sanctioned by the owner, he is precluded from subsequently setting up his title against the purchaser.   Acquiescence is an implied sanction of the sale.

In *Wendell* v. *Van Rensselaer*, 1 Johns. Ch. 344, 353, Chan-cellor Kent says : " There is no principle better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares, that if one man, knowingly, though he does it passively by looking on, suffers another to purchase and expend money on land, under an erro-neous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person.   It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel.   *Qui tacet, con-sentire videtur.   Qui potest et debet vetare, jubet.*"   And see the cases there cited.   " Though the right of the party who thus mis-

leads third persons by his silence be merely a reversionary interest, subject to a life estate in the person whom he suffers to act with the property as owner, yet, as appears from several of the cases, the application of the principle is the same."

The complainants, with full knowledge of the facts, standing by, and without objection allowing the bonds of the Berdell mortgage to be taken, and large sums to be invested upon the faith of its validity, would clearly, by reason and justice, be estopped from denying its validity afterwards. For a much stronger reason, after a lapse of twelve years, when large additional amounts have been invested and expended in the enterprise ; when those bonds have passed from one to another with the increased confidence and security which those years of silence on the part of the complainants have warranted ; when the property has passed under the mortgage to a new corporation, including, doubtless, at the filing of this bill, still other new and different stockholders, it would be manifestly unjust to set aside all these proceedings in behalf of the complainants, who might have enforced their rights before any of the bonds were put upon the market. These remarks apply equally to the holders of " common " and " preferred " stock.

In *Peabody* v. *Flint*, 6 Allen, 52, it was held that a delay of three years and a half by a minority of the stockholders in a railroad company to complain of a mortgage which they claimed had been fraudulently issued forfeited the right to equitable relief. Chapman, J., remarked, p. 57, that " in the mean time the stock in the corporation must have been frequently changing hands, and there are no means of adjusting the equities growing out of such changes ; " and, p. 58, that " a decree such as they now seek may injuriously affect many persons who have become stockholders or bondholders during the period of this delay."

See, also, *Royal Bank of Liverpool* v. *Grand Junction R. R.* 125 Mass. 490.

Strongly in point is the case *In re Pinto Silver Mining Co.* L. R. 8 Ch. Div. 273.

The petitioner was a creditor of the Pinto Company under a mortgage given to trustees. The company voted to wind up by voluntary liquidation, and to sell all its property subject to the

existing mortgage debt.    The liquidators made a contract to sell, followed by an ordinary conveyance, free from incumbrances, to another company, composed almost entirely of stockholders of the Pinto Company, with an arrangement that creditors of the old company should take the bonds of the new company in lieu of the mortgage security.    At a meeting of the mortgagees a large majority approved of the contract, and took the bonds of the new company accordingly; but though the petitioner knew of these proceedings, he took no part in them and never released his debt, nor did the trustees under the mortgage make any transfer to the new company.    After three years the petitioner claimed that there had been no legal dissolution of the company, because there had been no legal sale of the property, and that he did not know that the liquidators had departed in the convey-ance from the terms of the vote until just before he filed his petition.    Hall, V. C., decided that as to the petitioner and other unsatisfied creditors the company was not legally dissolved; but, on appeal, this decision was reversed upon the ground that the petitioner was estopped from disputing the validity of the dissolu-tion by reason of his acquiescence for three years.

James, L. J., says, p. 284 : " I am of opinion that the peti-tioner is estopped from disputing the validity of the dissolution. . . . When a person, having knowledge of what is being done, assents by his trustees to the transfer of the property of the com-pany to another company, being aware that the former company was in course of winding up, and takes no step during the whole of that winding up, it is utterly out of the question that he should be at liberty to come after the lapse of years and upset all that has been done."

To the same effect Cotton, L. J., says, p. 285 : " Moreover, the petitioner has substantially been aware of all that has been done; he knew that the property was to be transferred to the other company, and that a final meeting was called to consider the liquidators' account.    After having thus lain by, he cannot now come to have the proceedings ripped up."

But the complainants claim that the sale was void by reason of fraud and misrepresentation on the part of the Boston, Hart-ford, and Erie Railroad Company, and that their suit was brought

as soon as they discovered the fraud. While few, if any, of the transactions of that company which have been brought to our attention are remarkable for simplicity and plain dealing, we do not find such convincing proof of fraud in this case as to warrant our proceeding upon that ground.

There are three fraudulent representations claimed by the complainants:

1. That the indebtedness of the Southern Midland Railroad Company, including the cost of completing the road, should not exceed $1,000,000; but at the hearing this was expressly waived as a representation, though not as a condition. We do not think, however, that it was a condition, but rather an estimate, or, as it is termed in the contract, an " understanding and agreement."

2. That the stock subscription of $5,000,000 was subsequently cancelled.

This was indeed a peculiar transaction, not altogether above the suspicion of intentional misleading; yet we cannot say that it was a fraud. The contract provided for the purchase of the Southern Midland Railroad and the franchise of the Thompson and Willimantic Railroad Company for 50,000 shares of stock, or $5,000,000. The owners of these roads were subscribers to the Boston, Hartford, and Erie Railroad Company; hence, by turning over the road, they virtually paid for the 50,000 shares, and were entitled to have their subscriptions cancelled. It could have made no difference if they had paid that amount in cash for their stock, and then received it back from the company for the railroads at the agreed price. True, the complainants may have supposed that the subscription was to be paid in cash as capital for the company, in addition to the purchase of the railroads for stock; but there is no such provision in the agreement, and we cannot therefore find that there was such a representation or condition.

3. That thirty-five eighty-fifths of the additional stock issued was not put into the hands of trustees pursuant to the agreement.

Clearly this cannot be held to be a condition.

If under the agreement the trustees were entitled to receive additional shares of stock they could have compelled its issue;

indeed there seems to have been little reluctance on the part of the officers of the Boston, Hartford, and Erie Railroad Company to issue stock, and it does not appear that it was ever demanded by the trustees. Even if it were fraudulently withheld, this could not operate to invalidate a title which had previously passed under a conveyance.

The complainants urge that the New York and New England Railroad Company cannot be regarded as an innocent purchaser, because it took the property with notice of their claims. It is true that the decree approving the deed from the trustees under the Berdell mortgage contains a provision that nothing therein contained " shall at any time be construed to affect or impair in any way or manner the rights of any person or corporation claiming to hold stock, whether common or preferred, in the Hartford, Providence, and Fishkill Railroad Company, or of any person or corporation not party to this suit." This is quite vague as a notice to a purchaser, but it is to be remembered that the stockholders of the New York and New England Railroad Company were not then buying the road ; they were already the owners of it by virtue of being bondholders, and were simply taking the legal title to themselves. The mortgage, and not the deed, was the foundation of their title, and it is not claimed that the bondholders had any notice of a disaffirmance of the sale. But, assuming that the provision in the decree was a notice, what could the purchasers have ascertained if they had undertaken to investigate the matter ? Could they have found that the alleged ownership of the Boston, Hartford, and Erie Railroad Company had ever been disputed ? that anything had been done to set aside the sale, or that " any person or corporation claiming to hold stock, whether common or preferred, in the Hartford, Providence, and Fishkill Railroad Company " had in any way, during the twelve years, shown any dissent, otherwise than by the fact that some had not taken pay for their stock? Was there any notice that the complainants had ever made or intended to make any claim of ownership in the property ? Then too this was in 1875, twelve years after the sale, when the mischief arising from acquiescence and delay had already been occasioned. Therefore whatever effect might be given to the notice, if it were necessary to

pass upon it, it is clear that it came too late to do any good to the purchaser, or to save the rights of the complainants.

The decree for the deed from the assignees of the Boston, Hartford, and Erie Railroad Company contained a similar reservation, but that is unimportant, as that decree was subsequent in date, and the conveyance simply ancillary to the title under the mortgage.

We therefore conclude that although there was a voidable sale of the property in question, it cannot now be set aside for the complainants by reason of their acquiescence and delay; that there is no proof of fraud, the recent discovery of which would entitle them to relief; that the stipulations in the agreement above referred to were not conditions precedent to the passing of title, and that the New York and New England Railroad Company is not affected by the reservations in the decrees of 1875.

MATTESON, J., concurred.

POTTER, J., dissenting. The complainants file this bill in equity for themselves and others, stockholders in the Hartford, Providence, and Fishkill Railroad Company, claiming relief against certain proceedings of the New York and New England Railroad Company and the trustees under certain deeds.

It being proved that some of the complainants were owners of stock in the Hartford, Providence, and Fishkill Railroad Company, the validity of whose acts sanctioned by a majority of the owners of its stock is in question, it is not necessary to inquire further as to the ownership of the stock.

And it is admitted that demand was made on the Hartford, Providence, and Fishkill Railroad Company to bring suit.

The Legislature of Rhode Island at its June Session, A. D. 1846, granted a charter to the Providence and Plainfield Railroad Company to build a railroad from Providence to the line of the State of Connecticut.

By section 16 of the charter they were authorized to " *unite* with a railroad company " of any other State " to continue said railroad westward; and when the two companies shall be so united, the stockholders of one company shall become stockholders in the other company, and the companies shall constitute one corporation, by such name as the united corporations shall adopt."

There were further provisions for organizing a united corporation and for the performance of its duties.

By section 21 it was provided that "in lieu of the union" so provided for, the company might *unite* with such other corporation "by leasing their said railroad to such other company or taking a lease of such other road, or "by any other contract or agreement."

This charter was granted subject to the general law of Rhode Island, by which all acts of incorporation might "be amended or repealed at the will of the General Assembly, unless express provision be made therein to the contrary." Digest of 1844, p. 65, § 3.

In July, A. D. 1849, two companies chartered by the State of Connecticut, *i. e.* the New York and Hartford Railroad Company, and the Hartford and Providence Railroad Company, were by the authority of the legislature of that State consolidated under the name of the Hartford, Providence, and Fishkill Railroad Company.

At the January Session, A. D. 1851, of the Legislature of Rhode Island, an act amending the charter of the Providence and Plainfield Railroad Company was passed authorizing a mortgage, and containing certain provisions in contemplation of a union with the Connecticut road.

In A. D. 1851, the Providence and Plainfield Railroad Company, united with this Connecticut Company so formed, under the name of the Hartford, Providence, and Fishkill Railroad Company, and this union was ratified at the January Session of the Legislature of Rhode Island, A. D. 1852.

The Hartford, Providence, and Fishkill Railroad Company being thus formed, the State of Connecticut, in A. D. 1863, chartered the Boston, Hartford, and Erie Railroad Company, and it was organized in July. It was not incorporated in Rhode Island.

And on August 28, A. D. 1863, an agreement was made between this company and the Hartford, Providence, and Fishkill Railroad Company. This agreement is the principal subject of controversy in the present suit, its validity being attacked on the ground that it was fraudulent and *ultra vires.* The Hartford, Providence, and Fishkill Railroad Company were to make, and subsequently did make, a deed of their road and corporate fran-

chises to the Boston, Hartford, and Erie Railroad Company, and probably because the validity of the deed might be questioned, they also made a lease for nine hundred and ninety-nine years, with the right to have it renewed for a second term of nine hundred and ninety-nine years.   While the lease or sale was made by the corporation, the consideration, except the assumption of its debts, was paid not to the corporation but to the stockholders.   Each stockholder of the Hartford, Providence, and Fishkill Railroad Company was to receive a certain amount of stock of the new company on surrendering his stock in the old company, or might elect within a certain time to take a fixed sum in cash, $10 for each share of common, and $20 for each share of preferred stock, for his stock in the Hartford, Providence, and Fishkill Railroad Company.

The new company was to buy, for not over $5,000,000, two certain railroads and have them conveyed to the new corporation. The new company was organized by a subscription at Norwich of $5,000,000, on which nothing was paid in money, but the subscribers to the stock owned the two roads and conveyed them to the new company for $5,000,000, and then voted to cancel their subscriptions.

The contract is very truly described by the respondents as *a somewhat complicated one.*

It is claimed by the complainants that this contract was *ultra vires* and void for want of power in the Hartford, Providence, and Fishkill Railroad Company to make it.

There are two grounds on which the proceedings of corporations may be *ultra vires* and void, *i. e.:*

*First.* As regards the State; the State confides to corporations certain powers, often great powers, affecting materially the rights and property of others.   Public policy requires that they should be strictly confined to the limits fixed in their charters.   They are the mere creatures of the law, and can have no powers but such as are expressly or by necessary implication given to them.

*Second.* "Because the individual stockholders of the company have a right to require that the corporation shall be confined to its legitimate business.   They have invested their money on the faith that it will be so confined.   A majority have no power to

change it.  The stockholders have invested their money also on the faith that its business will be managed by the officers provided for in the charter, and in whose election they have a voice; and while a majority through their officers and agents may make many binding contracts, they cannot transfer the whole control of their affairs to a body foreign to themselves."  *Allen* v. *Woonsocket Company*, 11 R. I. 288, 290.

" The act of incorporation is to them an enabling act.  It gives them all the power they possess :  it enables them to contract; and when it prescribes to them a mode of contracting, they must observe that mode, or the instrument no more creates a contract than if they had never been incorporated."  Per Marshall, C. J., in *Head & Amory* v. *The Providence Insurance Co.* 2 Cranch, 127, 169.  The corporation is a mere creature of the law and can exercise no powers not conferred upon it.  See *Central Railroad Co. et al.* v. *Collins et als.* 40 Ga. 582; *Pacific Railroad Co.* v. *Seeley*, 45 Mo. 212; *Pearce* v. *Madison & Indianapolis Railroad Co.* 21 How. U. S. 441; *Perrine* v. *Chesapeake & Delaware Canal Co.* 9 How. U. S. 172; *Bank of Augusta* v. *Earle*, 13 Pet. 519.

What power then had the Hartford, Providence, and Fishkill Railroad Company to unite with another corporation or to lease or to sell to it?

It is a well settled principle of corporation law that when two corporations created by different States are consolidated, the new corporation can have in each State only the powers which the old corporation had in that State unless the legislature of that State, by the act of consolidation or other act, confers greater powers on it.  And in this instance the State of Connecticut could pass no act to affect the existence or powers of the corporation in Rhode Island any more than Rhode Island could to affect it in Connecticut.  By mere consolidation without further grant, the new corporation could only exercise in Rhode Island the powers of the old Rhode Island corporation; and so as to Connecticut.  The Legislature of Connecticut could give the new corporation no new powers of control over the property in Rhode Island.  Nor could they take away any: the charter might be repealed in one State and still subsist in the other.

There is an important difference between union and consolida-

tion.   The latter ordinarily creates a new corporation into which the old ones are merged.

In the case of the Blackstone Canal Co. for making a canal partly in Rhode Island and partly in Massachusetts, the acts of union provided for an amalgamation of the stock, so that there should be the same stockholders in each company, but did not provide for consolidation.   Judge Story held that each corporation still retained its separate existence in the State which had chartered it, although the stockholders were the same.   *Farnum* v. *Blackstone Canal Corporation*, 1 Sumn. 46.   And even declaring that they are to be a joint company does not necessarily consolidate them.   There must be a grant of the corporate powers to the new company as a new company.   It is not necessarily a dissolution of the old; that depends on the intention of the legislature.   So Judge Strong in *Central Railroad & Banking Co.* v *Georgia*, 2 Otto, 665, 673.   And even if consolidated, the new corporation stands in the place of each of the old ones, and holds and can exercise the privileges which belonged to each as to its portion of the road, and as to each portion of the road is subject to the general laws of the State in which it lies, and subject to repeal, &c., if the legislature of that State has such power.   *Philadelphia & Wilmington Railroad Co.* v. *Maryland*, 10 How. U. S. 376; *The Delaware Railroad Tax*, 18 Wall. 206; *State of Ohio* v. *Sherman*, 22 Ohio St. 411; and for other cases, in some of which the courts held the intention was to create a new corporation, see *State* v. *Maine Central Railroad Company*, 66 Me. 488, 497, 510; *Clearwater* v. *Meredith*, 1 Wall. 25, 40; *Bishop* v. *Brainerd*, 28 Conn. 289, 299; *Platt* v. *New York & Boston Railroad Co.* 26 Conn. 544; *McMahan* v. *Morrison*, 16 Ind. 172; *Hamilton Mutual Insurance Company* v. *Hobart*, 2 Gray, 543; *Commonwealth* v. *Atlantic & Great Western Railway*, 3 Pa. St. 9.

In *Ohio & Mississippi Railroad Co.* v. *Wheeler*, 1 Black. 286, 297, Taney, C. J., in delivering the opinion of the court, says it is true the corporation had been chartered by both States, and is spoken of in their laws as one corporate body.   " Yet it has no legal existence in either State except by the law of the State, and neither State could confer on it corporate existence in the other,

nor add to or diminish the powers to be there exercised.   It may, indeed, be composed of and represent under the corporate name the same natural persons.   But the legal entity or person which exists by force of law can have no existence beyond the limits of the state or sovereignty which brings it into life, and endues it with its faculties and powers."   The declaration in that case had described the plaintiff as a corporation created by two States.   It was held that it was a distinct and separate corporate body in each State, and they could not join in suing.

It was said in the respondent's argument that the Connecticut charter of the Boston, Hartford, and Erie Railroad Co. in A. D. 1863, by sections two and four, gave that company power to purchase, contract with, lease or take leases of, or make joint stock with any portion of the contemplated road from Boston to the Hudson River.   True, it did as to the Boston, Hartford, and Erie Railroad Company, but as before said, it could have no effect on any railroad property in the jurisdiction of another State, *i. e.* it could not authorize the Hartford, Providence, and Fishkill Railroad Company to dispose of their railroad in Rhode Island without the consent of the Legislature of Rhode Island, and then the power would be derived from Rhode Island and not from Connecticut.

The respondents have referred us to a decision in New York, *In the Matter of the Prospect Park & Coney Island Railroad Company*, 67 N. Y. 371, 377, holding that where two corporations wish to unite, it is enough if the charter of one of them contains a power to unite, as it cannot unite unless it can find some other corporation willing to unite, and if it does, the other company gets power to unite from the charter of the one which contains it.   If such a decision was made it is certainly a strange one, but not stranger than another made in the same State in *Gould* v. *Hudson River Railroad Co.* 6 N. Y. 522.   It has generally been regarded as sound law that the stockholders invested their property upon the faith of what was contained in their own charter and were not bound to look to any other, unless referred to in their own, and that a majority could bind a minority only when their own charter allowed or contemplated it.

It is argued by the respondent that the legislature having the

right to alter, amend, or repeal, have a right to unite corporations, to compel a union even without the consent of the stockholders. This is a very broad proposition, of which, if adopted, the consequences could not be foreseen. It is to be presumed the legislature would always have a proper regard for the preservation of the public faith, and for the rights of property of those who had invested in reliance upon their charter. And if the alteration was such as in effect to make a new corporation, it might be a question whether in Rhode Island it would not fall within the spirit if not the letter of the provision of our Constitution hereafter referred to requiring notice to be given before the legislature can do it. *Zabriskie* v. *The Hackensack & New York Railroad Company*, 18 N. J. Eq. 178.

In the present case it is not disputed that the Providence and Plainfield Railroad Company was chartered with a view to a continuation westward.

What powers did the Hartford, Providence, and Fishkill Railroad Company have to unite, lease, or consolidate, apart from legislative action ?

In the old Providence and Plainfield Railroad Company's charter it was provided by section 16 that it might *unite* with any other road continuing westward. They did unite with the Hartford, Providence, and Fishkill Railroad Company, and this power was thus exercised and exhausted. It can hardly be seriously argued that this power of union was to continue forever.

It would be as sensible to argue that when a lease with covenants contains a covenant for renewal, the new lease must contain a covenant for renewal, and so on *in perpetuum*.

The power had accomplished its object. The Providence and Plainfield Railroad Company had united with the Hartford, Providence, and Fishkill Railroad Company leading westward. And the Act of January, A. D. 1852, cannot be construed to give further powers of union. There was no need that all the roads should form one corporation. By the twenty-first section of the Providence and Plainfield Railroad Company's charter the company was authorized, *in lieu of uniting*, to lease or take a lease, &c. It is enough to say that this power was only to be exercised in case the other was not, and the power to unite having been used the other alternative grant of course fails.

And the power to lease must receive a reasonable construction. While a sale was evidently illegal, it seems plain that the corporation cannot accomplish indirectly what they cannot do directly. A lease for nine hundred and ninety-nine years is practically a sale. It is an evasion of the law. It would seem looking a great way ahead to provide, as they have done, for a renewal of such a lease.

They have also provided that the Boston, Hartford, and Erie Railroad Company may use the name of the Hartford, Providence, and Fishkill Railroad Company to condemn lands. This cannot be considered as anything less than a breach of trust on the part of the Hartford, Providence, and Fishkill Railroad Company.

We are therefore all of opinion that the contract, deed, and lease were *ultra vires* and void.

If then the contract and lease and deed so made were beyond the power of the corporations to make, what was the effect of the ratification by the legislature by its Act of March 2, at the January Session, A. D. 1865.

While the lease was of the railroad and property, the deed executed at the same time purports to convey the railroad franchise, &c., and purports to be executed by authority of the States of Rhode Island and Connecticut. Whether material or not, it may be noticed that the ratification is not of the agreement nor of the lease, but of the sale or deed.

Have the legislature the power to confer on a foreign corporation the right of eminent domain?

The right of eminent domain is a portion of the sovereign power of the State. In the theory of the older English law writers, and some American, it is founded on the idea that the government was the original proprietor of the soil, and granted it to the subject reserving the right of resuming it if required for the public use. Such a theory has no foundation in the settlement of this State. Our ancestors claimed title to the soil from the native Indians, and looked to the king only for a charter of government, and that rather as confirming what they themselves had previously done. Very little of the soil in Rhode Island is held under grants from the State.

But upon whatever theory originally founded, the law is well settled.  The right exists in the government to take private property for public use, in cases where necessity requires it, and the legislature is ordinarily the judge of that necessity.  It is an enormous arbitrary power to seize the property of the citizen without or against his will, and apply it to public uses.  But it must be for the public use, and for the use of the people of this State.  The legislature of this State cannot seize and condemn the land of its people for the good of the people of Connecticut, nor indeed for the good of the nation.  If needed for the purposes of the General Government, that government must act for itself.  And the right to hold the property when taken is just as much an exercise of the power of eminent domain as the original taking is.

As this power can only be exercised by agency or delegation, it has been delegated to domestic corporations.  But it is only because the corporations undertake to perform duties to the public, not for the private benefit of stockholders.  The latter may be incidental, but cannot be the ground of the grant.  And these public duties they may be compelled to perform.  The grant is a public trust for the abuse of which they may be held responsible.  In many cases legislatures have bound themselves not to grant similar privileges to others, thus increasing the value of the grant as private property, and depriving other portions of territory of similar privileges.

And there is a wide difference between granting this enormous power to a foreign or domestic corporation.  In the latter case, if the power was abused, the legislature itself can in many cases regulate or revoke the power by altering, amending, or repealing the charter.  The legislature has full control, and in all cases could regulate the exercise of the power, and prevent its abuse by general laws for the public good.  But in case of a grant to a foreign corporation, it might be claimed to be such a grant or compact as is beyond the control of the legislature.  And for breaches of contract and damages it might do to the business or lives of our citizens, the remedy would be seriously obstructed.

The State of Connecticut, by a statute of July, 1869, to which the respondents refer, has given to railroad corporations very large

powers of contract and leasing. New York, by an Act of May 20, 1869, quoted in one of the cases cited by the respondents, has given to such corporations very large powers as to consolidating with the roads of other States. To powers of consolidation there is not the same objection, as according to the decisions of the courts the corporation still remains a corporation in each State. In some western States laws have been passed authorizing the sales of roads to corporations of other States.

The importance of the question, *i. e.* the power to grant this portion of sovereignty to a foreign corporation, leads to an examination of the reported cases. In the treatises on the subject we are referred to but few cases. *The Matter of Townsend,* 39 N. Y. 171 ; *Morris Canal & Banking Company* v. *Townsend,* 24 Barb. S. C. 658; *New York & Erie Railroad Company* v. *Young,* 33 Pa. St. 175. In these cases the right claimed seems to be assumed, as we might naturally suppose it would be from the nature of the legislation of these States. But the question was not seriously argued or discussed by counsel or court.

There is an apparent recognition of the power in *Railroad Company* v. *Harris,* 12 Wall. 65, 82. The question was whether acts authorizing the continuance of a railroad into another state or district operated merely as a permission, or as creating a new corporation, and the only question in the case was as to how the corporation should be sued. The court in their opinion do indeed say, " Nor do we see any reason why one State may not make a corporation of another State, as there organized and conducted, a corporation of its own, *quoad hoc* any property within its territorial jurisdiction. That this may be done was distinctly held in *The Ohio & Mississippi Railroad Company* v. *Wheeler,* 1 Black. 286, 297. It is well settled that corporations of one State may exercise their faculties in another, so far, and on such terms, and to such extent, as may be permitted by the latter. We hold that the case before us is within this latter category."

So far as the first paragraph of this is concerned, the making it a corporation within this State, that is disposed of here by our Constitution, which provides that it can only be done after public notice. And so far as concerns the latter paragraph, it is undisputed law, if confined to the cases in which it has been decided,

and which Judge Swayne cites as authorities.  The only cases he refers to are *Blackstone Manufacturing Company* v. *Inhabitants of Blackstone*, 13 Gray, 489, which related to taxing in Massachusetts property belonging to a Rhode Island corporation ; and *Bank of Augusta* v. *Earle*, 13 Pet. 519, 588, where the question was whether a bank chartered by one State could purchase bills of exchange without that State.

In neither of these two cases could the question of the right of eminent domain arise.  And in *Railroad Company* v. *Harris*, 12 Wall. 65, the only question was how the suit should be brought, and the court do not seem to have considered the relation of the question to the right of eminent domain as a portion of the sovereignty of the State at all.  The latter right would by no means follow from the mere general power to make ordinary business contracts.  There was formerly a great conflict of opinion as to whether a corporation could in any case act extra-territorially, or could be acknowledged to have any existence out of the State which created it ; and many of the cases have turned on this point, and have related to banks and business corporations exercising no power of eminent domain ; and a great number of the cases in the United States courts have turned upon the point of the citizenship of a corporation, and in what State it could sue in the federal courts.

And so far as relates to railroad corporations acting extra-territorially in making certain classes of contracts, it may be considered as settled by previous decisions affecting corporations generally : but to hold that it extends to authorize a corporation to sell its right of eminent domain, or that a legislature may delegate the right of eminent domain to foreigners, or ratify it when attempted to be done by others, is a very different matter.  If this is a specimen of what is called legal logic, the less of it the better.

But a doubt may be suggested from the fact that it is laid down in some works that the right of eminent domain may be granted to an individual, and if granted to him while resident, and he remove from the State, that this would be inconsistent with the view I have taken.

When our Constitution was formed no one probably dreamed

that it would ever be claimed that a State could grant to an individual this enormous power to take the land of others. The idea has evidently come from an extension of the principle of our old flowage laws. Even the mill acts · which were passed in early times, when grist-mills and saw-mills were matters of necessity, and land almost worthless; and which were afterwards extended to mills for manufacturing cotton, &c., were only defended originally on the ground that they did not authorize the taking of another's land, but only the raising of one's dam on his own land, and that the flowing was only an easement causing consequential damage ; and courts have many times intimated that if the question was a new one they might not be sustained. But these laws have stood too long, and too much property has been invested on the faith of them, to be now questioned. But no legislature, so far as I know, ever went the length of authorizing one man to take another's land for the purpose of building a mill upon it, except the Assembly of North Carolina, which by the Act of A. D. 1777, cap. 23, authorized land to be taken for grist-mills, but declared the mill when erected to be a public mill ; and the Supreme Court of Tennessee, in *Harding* v. *Goodlett*, 3 Yerg. 41, refused to extend it to a paper-mill. Such an act passed in a semi-civilized state of society can hardly be a safe precedent.

Mills on Eminent Domain, the latest treatise, does indeed state that a legislature may grant this power to an˙ individual, and he cites certain cases as sustaining this doctrine. Let us examine them. In *Crittenden* v. *Wilson*, 5 Cow. 165, an act had authorized a man to build a dam on his own land which might obstruct a navigable creek and also flow the land of others. This is in principle the same as our mill acts.

*Boston Water Power Company* v. *Boston & Worcester Railroad Company*, 23 Pick. 360. The legislature had granted to one corporation power to take certain property previously granted to another. What this has to do with the present case would require pretty sharp eyes to see.

*Beekman* v. *The Saratoga & Schenectady Railroad Company*, 3 Paige, 45, was a case of grant to build a railroad to Saratoga. It was contended that the grant was for the benefit of a particular village, and not for the benefit of the public generally. But

the grant was to a domestic corporation; and although Chancellor Walworth does say, p. 73, that it might be done by private enterprise, yet this was not in question, and he cites no case nor instance whatever to support his *dictum.* He did indeed quote himself in *Bloodgood* v. *The Mohawk & Hudson Railroad Company*, 18 Wend. 9, 13. But both were cases of corporations, and not of individuals.

*In the Matter of Kerr*, 42 Barb. S. C. 119. This was a case where the New York Legislature had given to certain persons or their assigns the right to make a street railroad in New York city, and to cross other such railroads. To understand this case it is important to know that in New York city the fee of the streets is in the public, and that here no taking of private land was in question. While holding that the franchise of a corporation may be taken for public use, and for this he cites several decisions, it being admitted law, the judge says he can see no reason why the right of eminent domain cannot be delegated to individuals if it can be to corporations, but cites no authority, nor does it appear that the question was considered. The decision might well be based on the general power of the State over its highways.

*The Buffalo & New York City Railroad Company* v. *Brainard*, 9 N. Y. 100, decides that the legislature had power to authorize the formation of railroad corporations by general law. There is not a word in the opinion of the court about conferring it on individuals.

*North Missouri Railroad Company* v. *Gott*, 25 Mo. 540. In Missouri there was a general railroad law for the formation of railroad corporations. The plaintiffs had a charter, and the question was as to the validity of proceedings under one or the other.

*The Tide Water Canal Company* v. *Archer*, 9 Gill & J. 479. In this case the land had been taken by a corporation under an act of the Legislature of Maryland. The court in giving their opinion, p. 483, do say that it is " equally well settled now and certainly in this State that this right may be exercised for the benefit of the public by individuals or by corporations." But the question was not at issue, nor before the court, nor argued there.

*State* v. *Boston, Concord & Montreal Railroad Company*, 25 Vt. 433. I cannot agree with my brethren in considering that the decision in this case has any bearing of any consequence upon the case now before us. The defendants, a corporation created by New Hampshire, had made a bridge and purchased lands in Vermont, claiming to hold them in fee, and *quo warranto* was applied for against them. The question was whether aliens, and especially a foreign corporation, could hold lands in Vermont. It appeared that defendant corporation were building a railroad in New Hampshire to the line of Vermont, for the purpose of uniting with two Vermont roads which had express permission in their Vermont charters to unite with the New Hampshire road. The land they bought was almost indispensable, the court say, to their business if they should so unite. And the sole question was, not whether they could build, or hold, or operate a railroad in Vermont, but whether they could hold this land in fee. Judge Redfield, after saying that all the functions of a corporation are in one sense franchises, *e. g.* the right to hold property, to sue and be sued, to contract, &c., are franchises, and must be recognized wherever the existence of the corporation is for any purpose recognized, continues: " But the right to build and run a railroad and take toll or fares is a franchise of the prerogative character, which no person can legally exercise without some especial grant of the legislature. And we should not of course be expected to suffer a foreign railroad to usurp the exercise of any franchises of this character." They would have " a right to build their road to the very line of the State, if they could obtain the land for that purpose, without coercive measures. They could not perhaps compel the land-owners to yield the right of way . . . without a grant from the legislature of the prerogative power to exercise the right of eminent domain over lands in this State." pp. 442, 443. And the court held there was nothing to justify the issuing of the writ of *quo warranto*, as the defendants merely held the land the same as any other proprietor would.

Now a decision upon this point by the Supreme Court of Vermont, more especially at the time when Judge Redfield presided over it, would be entitled to the highest respect. But it does not appear that the point made in our own case was discussed before

the court, and what is said in the opinion is only by implication, and the grant of power intended by the court might have been to consolidated or united corporations. And it does not even by implication affect the question of granting the power to a private individual.

In *Bank of Middlebury* v. *Edgerton et als.* 30 Vt. 182, in which case the railroad had been leased to an individual for three years, Bennet, J., says, p. 190 : " The right to build, own, manage, and run a railroad, and take tolls thereon, is not of necessity of a corporate character or dependent upon corporate rights. It may belong to and be enjoyed by natural persons, and there is nothing in its nature inconsistent with its being assignable. See *Peter* v. *Kendall*, 6 B. & C. 703 ; Comyns' Digest, title Grant C."

Now let us look at these authorities. Comyns mentions among things which may be granted, a franchise, such as a market or a fair, and he mentions no other. *Peter* v. *Kendall* related to a ferry grant, which of course may be granted to an individual.

And the case of the grant by the State of New York to Fulton and Livingston of an exclusive steamboat privilege was a monopoly, excluding others from interfering with them in navigation, but no power of eminent domain or taking anybody's property was granted to them. *Gibbons* v. *Ogden*, 9 Wheat. 1.

In *Young* v. *Buckingham*, 5 Ohio, 485, the Legislature of Ohio had granted to one Dillon and his associates power to erect a toll-bridge, and to take land, &c. Evidence was offered· that before the bridge was erected a public highway was laid out, and the bridge was erected on it. This evidence was rejected, and, as the Supreme Court held, improperly. The bridge had stood as it was about twenty years before the plaintiff brought his suit. The question of the right to grant to individuals does not seem to have been raised. It may have been assumed, and there is nothing to show that the decision was not influenced by the other facts in the case, *e. g.* it being actually built upon a highway.

To say that these cases establish the right·of a legislature to delegate a portion of the sovereignty of the State to a private person seems to assume too much, when it does not appear that the question was made or discussed in any of them.

Like mills, toll-bridges in fact make a class by themselves.

So far as concerns navigable rivers, the legislature has full power to regulate them. And, as to the land on which the terminal abutment rests, the public have already acquired an easement, and it is only a question of additional burden, if burden it can be called.

So with ferries where no one's land is taken, but the privilege consists in excluding others from the right of carrying passengers. In the course of time the privilege and wharf may become separated from the upland.

It was going far enough to hold that this power of eminent domain might be granted to corporations. It will be seen from these cases that the authority to grant it to individuals does not rest on any very good foundation. Because the legislature may grant certain franchises to individuals, it does not follow by any analogy or sound reasoning that they should grant to one man the right to take another's property.

And there is a reason for the distinction between a corporation and a natural person. The State has no control over the latter; he may go away, and the grant to him may be construed by other courts to be a compact irrevocable under the Constitution of the United States; while a corporation chartered by the State cannot go out of it, and is always under the control of the legislature.

The logical outcome of many of the decisions and *dicta* on this subject of sacrificing private rights to a very slight public advantage is communism, and this it is to be presumed the legislature never intended. A man may for his own pleasure leave a space between his house and the highway for trees and flowers; a poorer neighbor might raise a good crop of corn and potatoes on it. The private benefit to the poor neighbor would be great, and the public benefit would also be great in supporting a family, encouraging the growth of population, and so strengthening the national power. Why should not the State grant him the right to do it on paying a rent to be fixed by state commissioners?

But there is another consideration. Our Constitution wisely requires that every petition to the legislature for a charter for a business corporation shall be continued over until after a new

election of members, and that public notice of its pendency shall be given as may be required by law ; and our statute, Gen. Stat. R. I. cap. 18, § 2, requires that notice of the pendency of the bill and its purpose shall be given, &c., &c., for three weeks preceding the election. The manifest intent of this is to provide that, *e. g.* in case of taking land for public uses, seldom allowed except for a railroad, persons whose lands or interests are to be affected should have an opportunity to appear before the legislature and see that their rights were properly protected. When this statute was first enacted no one dreamed of a private individual building a railroad.

In Massachusetts, the notice, although provided for by statute only, and not by the Constitution, is required to be very particular, and by their present practice plats are required to be presented, so that when the act is passed the condemnation is really made by the legislature itself.

The provision in the Constitution was, as I have said, intended to prevent grants of great privileges being passed through the General Assembly without giving the people an opportunity to express their opinions. But if the legislature could grant them without notice to a foreign corporation already chartered, this object would be entirely defeated. By going into a neighboring State and procuring a charter, our own citizens might evade it. As I have said, the power to hold a road already made is just as much an exercise of the right of eminent domain as the original taking. And if they could grant power to hold it they could grant power to take it.

And could the Constitution intend that the legislature might grant to a foreign corporation, by ratification of a sale or otherwise, these great powers without notice, when they could not do it to our own citizens at home ? It is true that in the present case a certain notice was given, but if the legislature had power to ratify a sale no notice was necessary.

I feel obliged, therefore, to conclude, dissenting in this from the majority of the court, that upon all sound principles the legislature had no power to ratify the sale in the manner they did. It was against the spirit, if not against the letter, of the Constitution. If it was a sale to a foreign corporation, would it not be

introducing a *new* corporation into this State ? It does not merely authorize it to make ordinary contracts, or have agencies here, but gives it a permanent home here. If so, it should be held void for the reasons before stated.

Can it be considered a consolidation, like some others we have in the State ? If so, it would still remain a corporation in each state, upon the decisions I have quoted. They might, like the old Blackstone Canal Company, have the same stockholders, and retain an entirely separate organization in each State, or if united as one company, could act in each State only as a corporation of that State. But it is difficult to construe a sale into such a consolidation as the courts intend when they use that word.

Did the Rhode Island Legislature intend by the ratifying act to make it a Rhode Island corporation ? If so, as it was not a corporation here before, it would be a new corporation within this State, and the legislature would not have the power to create it without the constitutional and statutory notice. We are told by the respondents that notice was given, but on referring to the manuscript records of the State for the January Session, A. D. 1865, we find the notice given was of a petition to confirm a sale, and not of a petition to create a Rhode Island corporation. The petitioners were evidently acting under the idea that the sale would be valid, and that they did not need a Rhode Island charter. And it is significant that the Boston, Hartford, and Erie Railroad Company styles itself a Connecticut corporation, in an act passed in A. D. 1869, four years after this ratification, and quoted in the respondents' brief. And the Boston, Hartford, and Erie Railroad Company was dissolved by a decree of the Connecticut courts in A. D. 1873. The parties evidently then considered it as only a Connecticut corporation, as it does not appear that they ever applied to have it dissolved in Rhode Island. In the very act of ratification by Rhode Island, it is described as a Connecticut corporation, and is nowhere spoken of as a Rhode Island corporation ; and if the parties themselves had intended to make it, or had looked upon it as such, they would not have reserved in the contract the right to use the name of the old corporation.

It is, indeed, made subject to Rhode Island laws. So far as it could be reached, it would have been so any how. But if a Rhode

Island corporation, it would have been subject to the power of the Rhode Island Legislature to alter or amend, but not if it remained only a Connecticut corporation. And those who drafted it, being residents of another State, may have intended that it should. Does the making it subject to the liabilities of the old company make it liable to repeal or amendment by the Rhode Island Legislature ? Our court may so hold. But it is a grant; and other courts may construe it to be a contract irrepealable and unalterable. It would have been very easy to have made this matter plain if the parties meant so.

It is said that the court cannot restore things to where they were, and that it cannot restore them to a corporation, the Boston, Hartford, and Erie Railroad Company, which has been deprived of its existence by the power which created it. It may be well, then, to consider where they are, and whether any restoration is necessary.

The Boston, Hartford, and Erie Railroad Company as a Connecticut corporation, has indeed been dissolved in Connecticut, but the Hartford, Providence, and Fishkill Railroad Company is still alive as a corporation, at least in Rhode Island. Its charter has never been, so far as we are informed; repealed or declared forfeited. If it had been, the land over which they held the easement would have reverted to the former owners. It is only by that charter, or by succession to it, that that corporation, or any other, can hold it. The stockholders may all be foreigners, but the corporation must be a Rhode Island corporation. The very agreement now in controversy evidently contemplated that the Hartford, Providence, and Fishkill Railroad Company's charter would continue to exist for ages, or the agreement would not have bound it to renew the lease at the end of nine hundred and ninety-nine years.

The Boston, Hartford, and Erie Railroad Company claim, by virtue of several assignments, to be the holder of the largest portion of the Hartford, Providence, and Fishkill Railroad Company's stock. This stock, as I understand, was never conveyed to the Boston, Hartford, and Erie Railroad Company, but to Bartholomew as trustee, and was conveyed by the assignees in bankruptcy to the New York and New England Railroad Company,

and under a decree of court delivered to them by said Bartholomew.

If they have obtained control of a majority of the stock, this court has no power to prevent their using the power it gives them, so long as they proceed according to their charter and the laws, and with a proper regard for the rights of the minority.

But it is claimed by the respondent, the New York and New England Railroad Company, that the Hartford, Providence, and Fishkill Railroad having been sold to the Boston, Hartford, and Erie Railroad Company, and the Boston, Hartford, and Erie Railroad having been sold to them, they are the owners of the road, *bonâ fide* purchasers for value and without notice, clothed with the legal title, and so consequently entitled to redeem, and that being so they are not affected by any equities between the Boston, Hartford, and Erie Railroad Company and the former owners. If they are entitled to redeem, then the Hartford, Providence, and Fishkill Railroad Company is not.

It is necessary, therefore, to examine the Berdell mortgage so called.

The Boston, Hartford, and Erie Railroad corporation being, in my view, a Connecticut corporation only, by deed of March 19, 1866, conveyed among other things its railroad in Rhode Island, between Providence and Willimantic, to Berdell and others, trustees, to secure an issue of bonds to the amount of $20,000,000. In the preamble it is described as a corporation existing under the laws of Rhode Island, &c. Among other extraordinary provisions, it contains one very remarkable. By section 10 the bondholders on taking possession may organize themselves into a corporation, choose directors and officers, fix a corporate name, &c., and the mortgage undertakes to invest this corporation so formed with all the franchises and powers of the Boston, Hartford, and Erie Railroad Company.

Whether they had power to make such a voluntary corporation for railroad purposes in Massachusetts or Connecticut, is not for the courts of this State to decide.

For certain purposes the power of voluntary incorporation has existed in Rhode Island since January, A. D. 1839; but not as to railroads. And so far as creating a Rhode Island corporation is

concerned, this provision must be considered as utterly void, so far as the mortgage could give any such power. One corporation cannot give authority to anybody to create another corporation, at least by the laws of this State.

But it is said this mortgage was ratified and confirmed by the Legislature of Rhode Island at its January Session, A. D. 1866. It is enough at present to say that so far as the mortgage pretended to give the bondholders power to form a new corporation in Rhode Island the legislature could not delegate to others, by ratification or otherwise, one of the most important powers of legislation ; and more, they could not delegate a power they did not possess themselves, *i. e.* a power to create such a corporation otherwise than as prescribed in the Constitution.

Under this provision, however, the bondholders did undertake to form a new corporation to which they gave the name of the New York and New England Railroad Company.

I call it a new corporation, for it would be difficult to say what is a new corporation if this is not. There is not only a new name, but a new stock created. The stockholders are in no sense, as it seems to me, successors of the old. And there is a new capital, and I think of a different amount.

If the legislature had provided by a general law in force before these transactions took place that when mortgagees took possession of a road, and the right of redemption was gone, they might apportion the old stock among themselves, and go on with all the rights, privileges, duties, and liabilities of the old corporation, there would be some ground for holding one to be the successor of the other. All stockholders in the mortgagor corporation then would have held subject to the law, and on the understanding that upon a foreclosure their stock passed to the mortgagees.

At the May Session, A. D. 1873, the Legislature of Rhode Island passed an act by which the New York and New England Railroad Company " is hereby recognized and declared to be a corporation invested with all the powers, privileges, and franchises, &c., and subject to all the duties, &c., of said Boston, Hartford, and Erie Railroad Company," and the proceedings in forming said corporation are ratified and confirmed.

It is difficult to see how an act of the Legislature of Rhode Isl-

and could validate the formation of a Connecticut or Massachusetts corporation, or could invest the new corporation with the franchises of a Connecticut corporation ; and as I have said the Boston, Hartford, and Erie Railroad Company, in my view, never had a corporate existence in Rhode Island.

But there is still another difficulty : if the act merely means to recognize the New York and New England Railroad Company as a Connecticut corporation, there was no need of it.   If it intended to make it a Rhode Island corporation, which it certainly was not before, then a Rhode Island corporation cannot constitutionally be created in that mode.   And for the same reason before given in regard to the Boston, Hartford, and Erie Railroad Company, the New York and New England Railroad Company has no legal existence as a Rhode Island corporation.   The notice given was only of a petition praying for an act *concerning* the New York and New England Railroad Company, and to confirm the transfer by the trustees.   But it is to be noticed that whatever effect this ratification might have had otherwise, it contained an express reservation of the rights of other persons and corporations, and the New York and New England Railroad Company accepted it with this qualification.

In the suit for foreclosure in Rhode Island under the Berdell mortgage, *Ellis et al.* v. *The Boston, Hartford & Erie Railroad Company et als.*, Equity, No. 991, at the March Term, A. D. 1875, the Hartford, Providence, and Fishkill Railroad Company was not a party.   Of course they are not bound by the decree of foreclosure made in that suit, June 30, 1875.   But further, the rights of the stockholders of the Hartford, Providence, and Fishkill Railroad Company, and of all persons and corporations not parties to the suit, are expressly reserved.   The deed from the assignees contained still broader notices.   Thus at its formation the New York and New England Railroad Company had notice of the existence of other claims.

In the suits in equity in the United States Circuit Court to redeem the mortgages there, the Hartford, Providence, and Fishkill Railroad Company were indeed made parties.   But that suit related only to the Connecticut portion of the road as stated by the respondents in their answer.

It is true the complainants in their bill designate the New York and New England Railroad Company as a Rhode Island corporation. But when the parties and the facts all are before us, the court is bound to know and to apply to the case the provisions of our Constitution and laws.

So far as concerns the point made by the complainant that the agreement of August, A. D. 1863, was without consideration, it cannot affect the validity of sales of stock voluntarily made by a portion of the stockholders for a price they chose to take.

As concerns the charges of fraud in the subscription to the stock of the Boston, Hartford, and Erie Railroad Company, we all agree that none is shown satisfactorily. And it is evident that the statement that the expenses of completing the railroad would not exceed $1,000,000 was an estimate only; if an agreement, we cannot consider it as a condition.

On the view I have taken the questions of laches and of the statute of limitations become unimportant.

My conclusion would be that the Hartford, Providence, and Fishkill Railroad Company is still in existence as a legal Rhode Island corporation, and entitled to the possession of the road on redeeming the Rhode Island mortgage and so much of the Berdell mortgage as might belong to them to redeem, if any, and any other debts or claims which by subrogation or otherwise the New York and New England Railroad Company may equitably hold against said road, or for any expenditures of money upon it. Whether the holders of the Berdell bonds who did not convert them into New York and New England Railroad Company stock were bound by the acts of their trustees in conveying to the new corporation, I express no opinion.

*Decree entered March* 12, 1881, *dismissing the bill without costs.*

*A. & A. D. Payne* and *John F. Tobey,* for complainants.

*Charles Hart,* for trustees of Hartford, Providence, and Fishkill Railroad Company.

*Nicholas Van Slyck,* City Solicitor, for City of Providence.

*William P. Sheffield, Benjamin F. Thurston, Edwin Metcalf & Simeon E. Baldwin,* for the other respondents.